[Cite as *Capital Care Network of Toledo v. State of Ohio Dept. of Health*, 2016-Ohio-5168.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Capital Care Network of Toledo        Court of Appeals No. L-15-1186

     Appellee        Trial Court No. CI0201403405

v.

State of Ohio Department of Health        **DECISION AND JUDGMENT**

     Appellant        Decided: July 29, 2016

* * * * *

Terry J. Lodge, Jennifer L. Branch and Alphonse A. Gerhardstein,
for appellee.

Mike DeWine, Ohio Attorney General, Eric E. Murphy, State
Solicitor, Stephen P. Carney and Peter T. Reed, Deputy Solicitors,
for appellant.

* * * * *

**SINGER, J.**

{¶ 1} This is an appeal from the judgment of the Lucas County Court of Common

Pleas which reversed the decision of appellant, Ohio Department of Health ("ODH").

For the reasons that follow, we affirm the trial court's judgment.

## Background

**{¶ 2}** Appellee, Capital Care Network of Toledo ("Capital Care"), is a medical facility located in Toledo, Ohio, which offers abortion services. Capital Care has been licensed by the ODH to operate an ambulatory surgical facility ("ASF") since at least 2010. An ASF is a health care facility where outpatient surgery is performed. Ohio Adm.Code 3701-83-15(A)(1); R.C. 3702.30(A). *All ASFs in Ohio are required to have a health care facility license, issued by the director of the ODH.* Ohio Adm.Code 3701-83-03(A); R.C. 3702.30(D), (E)(1).

**{¶ 3}** In 2010, Terry Hubbard became the owner of Capital Care. Before Ms. Hubbard purchased Capital Care, she worked for Capital Care for eight years as a registered nurse. In August 2012, Capital Care and the University of Toledo Medical Center entered into a written transfer agreement ("WTA"). A WTA specifies a procedure for the transfer of a patient from an ASF to a hospital in the event of a medical complication or emergency, and was required by Ohio Adm.Code 3701-83-19(E).

**{¶ 4}** In April 2013, Capital Care was notified by the University of Toledo Medical Center that the hospital did not intend to renew the WTA when it expired on July 31, 2013. Capital Care sought another hospital which would agree to a WTA, but was unsuccessful at that time.

**{¶ 5}** In August 2013, Capital Care was notified that ODH's director was proposing to issue an order refusing to renew and revoking Capital Care's health care

2.

facility license due to a violation of Ohio Adm.Code 3701-83-19, which required an ASF to have a WTA with a hospital.

{¶ 6} On September 29, 2013, Am.Sub.H.B. 59 ("H.B. 59") went into effect. The key provisions of the bill relating to the licensing of ASFs are codified in R.C. 3702.30 through 3702.33 and 3727.60. Pursuant to R.C. 3702.30(D) and (E)(1), all health care facilities, which includes ASFs, must have a license issued by the director of the ODH to operate. In order to obtain a license, an ASF must have a WTA with a local hospital, or be granted a variance from that requirement. R.C. 3702.303 and 3702.304. However, R.C. 3727.60 forbids any public hospital from entering into a WTA with an ASF which performs abortions. R.C. 3727.60 also forbids any public hospital from authorizing a physician who has staff privileges at the public hospital to use those privileges for an ASF, which performs abortions, to obtain a variance as a substitute for a WTA.

{¶ 7} Capital Care attempted to secure a WTA with a hospital in the Toledo area, but was unsuccessful. Therefore, in January 2014, Capital Care submitted to the ODH a WTA with the University of Michigan Health System of Ann Arbor, Michigan. However, in February 2014, Capital Care was notified that ODH's director was proposing to issue an order refusing to renew and revoking Capital Care's health care facility license for not having a WTA with a *local* hospital, in violation of Ohio Adm.Code 3701-83-19(E) and R.C. 3702.303. Capital Care requested a hearing on the proposed order. A hearing was held on March 26, 2014, before a hearing examiner.

3.

**{¶ 8}** On June 10, 2014, the hearing examiner issued a report and recommendation finding the WTA submitted by Capital Care in January 2014 did not comply with the requirements of R.C. 3702.303. The hearing examiner concluded since Capital Care did not have an acceptable WTA with a local hospital or a variance, Capital Care did not meet the licensing requirements of R.C. 3702.30. Accordingly, the hearing examiner opined the ODH director's decision not to renew and to revoke Capital Care's license was valid. Capital Care submitted objections to the report and recommendation.

**{¶ 9}** On July 29, 2014, ODH's interim director issued an adjudication order refusing to renew and revoking Capital Care's health care facility license based on the hearing examiner's findings, and in accordance with R.C. 3702.32, 3702.303(A), R.C. Chapter 119 and Ohio Adm.Code 3701-83-19(E). Capital Care appealed to the trial court.

**{¶ 10}** On June 19, 2015, the trial court rendered its decision reversing the interim director's order. The court found R.C. 3702.303, 3702.304 and 3727.60 (hereinafter "the licensing provisions") unconstitutional as applied to Capital Care because the WTA requirement and variance provisions contain unconstitutional delegations of licensing authority. ODH appealed.

**{¶ 11}** ODH sets forth one assignment of error:

On July 29, 2014, the Ohio Department of Health's Director issued an Order revoking the license of Capital Care Network for failure to have a

4.

written transfer agreement with a local hospital. The trial court erred when it found that this Order was not in accordance with law.

{¶ 12} ODH also sets forth two issues for review:

1. Does the U.S. Constitution allow Ohio to require ambulatory surgical facilities, as a licensing condition, to have a written transfer agreement with a local hospital or to obtain a variance from that requirement, and may it apply that requirement to abortion clinics on the same terms as other surgical facilities without violating the abortion-specific "undue burden" test or violating any purported rule against "delegating" state power to private parties?

2. Did the Director of Health properly conclude that a transfer agreement between a Toledo clinic and an Ann Arbor hospital 52 miles away either (1) does not qualify as a "written transfer agreement" with a "local hospital" under R.C. 3702.303(A), or (2) does not qualify as an agreement that adequately provides for safe "transfer of patients in the event of medical complications [or] emergency situations" under O.A.C. 3701-83-19(E)?

**Analysis**

{¶ 13} Preliminarily, let us put this case in the proper perspective. ODH complains that this is just another administrative appeal involving an ASF, and that it is not an abortion case. It is an abortion case. The regulations and statutes involved are

5.

directed towards abortion providers. *See, e.g.*, R.C. 3727.60 (prohibits all public hospitals from entering into a WTA with an ASF which performs nontherapeutic abortions and prohibits all public hospitals from authorizing a physician with staff privileges to use those privileges for an ASF which performs nontherapeutic abortions to obtain a variance as a substitute for a WTA). While the law does not forbid private hospitals from entering into a WTA with an ASF, private hospitals and physicians with privileges at private hospitals decline to enter into such agreements. Why? Such agreements with abortion-providing ASFs are controversial and fraught with consequences and issues undoubtedly not faced by ASFs which perform other types of services and procedures. *See Whole Woman's Health v. Hellerstedt*, 579 U. S. __, 195 L.Ed.2d 665, 688 (2016):

> Brief for Planned Parenthood Federation of America et al. as Amici Curiae 14 (noting that abortion facilities in Waco, San Angelo, and Midland no longer operate because Planned Parenthood is "unable to find local physicians in those communities with privileges who are willing to provide abortions due to the size of those communities and the hostility that abortion providers face").

**{¶ 14}** Therefore, since this is an abortion case, the trial court properly addressed the constitutional ramifications of the ODH interim director's adjudication order. We will do the same in addressing ODH's assignment of error that the trial court erred in finding the order issued by ODH's interim director was not in accordance with law.

6.

## Standard of Review

{¶ 15} The determination as to whether or not a statute is constitutional presents a question of law, which we review de novo. *Andreyko v. City of Cincinnati*, 153 Ohio App.3d 108, 2003-Ohio-2759, 791 N.E.2d 1025, ¶ 11 (1st Dist.). *See also David P. v. Kim D.*, 6th Dist. Lucas No. L-06-1164, 2007-Ohio-1865, ¶ 15.

## The Licensing Provisions

### R.C. 3702.303—Transfer Agreements Between Surgical Facilities and Hospitals

(A) Except as provided in division (C) of this section, an ambulatory surgical facility shall have a written transfer agreement with a local hospital that specifies an effective procedure for the safe and immediate transfer of patients from the facility to the hospital when medical care beyond the care that can be provided at the ambulatory surgical facility is necessary, including when emergency situations occur or medical complications arise. A copy of the agreement shall be filed with the director of health.

(B) An ambulatory surgical facility shall update a written transfer agreement every two years and file a copy of the updated agreement with the director.

(C) The requirement for a written transfer agreement between an ambulatory surgical facility and a hospital does not apply if either of the following is the case:

(1) The facility is a provider-based entity, as defined in 42 C.F.R. 413.65(a)(2), of a hospital and the facility's policies and procedures to address situations when care beyond the care that can be provided at the ambulatory surgical facility are approved by the governing body of the facility's parent hospital and implemented;

(2) The director of health has, pursuant to the procedure specified in section 3702.304 of the Revised Code, granted the facility a variance from the requirement.

**R.C. 3702.304—Variance from Written Transfer Agreement**

(A)(1) The director of health may grant a variance from the written transfer agreement requirement of section 3702.303 of the Revised Code if the ambulatory surgical facility submits to the director a complete variance application, prescribed by the director, and the director determines after reviewing the application that the facility is capable of achieving the purpose of a written transfer agreement in the absence of one. The director's determination is final.

(2) Not later than sixty days after receiving a variance application from an ambulatory surgical facility, the director shall grant or deny the variance. A variance application that has not been approved within sixty days is considered denied.

(B) A variance application is complete for purposes of division (A)(1) of this section if it contains or includes as attachments all of the following:

(1) A statement explaining why application of the requirement would cause the facility undue hardship and why the variance will not jeopardize the health and safety of any patient;

(2) A letter, contract, or memorandum of understanding signed by the facility and one or more consulting physicians who have admitting privileges at a minimum of one local hospital, memorializing the physician or physicians' agreement to provide back-up coverage when medical care beyond the level the facility can provide is necessary;

(3) For each consulting physician described in division (B)(2) of this section:

(a) A signed statement in which the physician attests that the physician is familiar with the facility and its operations, and agrees to provide notice to the facility of any changes in the physician's ability to provide back-up coverage;

(b) The estimated travel time from the physician's main residence or office to each local hospital where the physician has admitting privileges;

(c) Written verification that the facility has a record of the name, telephone numbers, and practice specialties of the physician;

(d) Written verification from the state medical board that the physician possesses a valid certificate to practice medicine and surgery or osteopathic medicine and surgery issued under Chapter 4731. of the Revised Code;

(e) Documented verification that each hospital at which the physician has admitting privileges has been informed in writing by the physician that the physician is a consulting physician for the ambulatory surgical facility and has agreed to provide back-up coverage for the facility when medical care beyond the care the facility can provide is necessary.

(4) A copy of the facility's operating procedures or protocols that, at a minimum, do all of the following:

(a) Address how back-up coverage by consulting physicians is to occur, including how back-up coverage is to occur when consulting physicians are temporarily unavailable;

(b) Specify that each consulting physician is required to notify the facility, without delay, when the physician is unable to expeditiously admit patients to a local hospital and provide for continuity of patient care;

(c) Specify that a patient's medical record maintained by the facility must be transferred contemporaneously with the patient when the patient is transferred from the facility to a hospital.

(5) Any other information the director considers necessary.

(C) The director's decision to grant, refuse, or rescind a variance is final.

(D) The director shall consider each application for a variance independently without regard to any decision the director may have made on a prior occasion to grant or deny a variance to that ambulatory surgical facility or any other facility.

### R.C. 3727.60—Limitations on Public Hospital Transfer Agreements

(A) As used in this section:

(1) "Ambulatory surgical facility" has the same meaning as in section 3702.30 of the Revised Code.

(2) "Nontherapeutic abortion" has the same meaning as in section 9.04 of the Revised Code.

(3) "Political subdivision" means any body corporate and politic that is responsible for governmental activities in a geographic area smaller than the state.

(4) "Public hospital" means a hospital registered with the department of health under section 3701.07 of the Revised Code that is owned, leased, or controlled by this state or any agency, institution, instrumentality, or political subdivision of this state. 'Public hospital' includes any state university hospital, state medical college hospital, joint hospital, or public hospital agency.

(5) "Written transfer agreement" means an agreement described in section 3702.303 of the Revised Code.

(B) No public hospital shall do either of the following:

(1) Enter into a written transfer agreement with an ambulatory surgical facility in which nontherapeutic abortions are performed or induced;

(2) Authorize a physician who has been granted staff membership or professional privileges at the public hospital to use that membership or those privileges as a substitution for, or alternative to, a written transfer agreement for purposes of a variance application described in section 3702.304 of the Revised Code that is submitted to the director of health by an ambulatory surgical facility in which nontherapeutic abortions are performed or induced.

### Undue Burden

{¶ 16} It has long been held the "State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." *Roe v. Wade*, 410 U.S. 113, 150, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

{¶ 17} In *Planned Parenthood v. Casey*, 505 U.S. 833, 843, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the United States Supreme Court adopted the undue burden test to determine whether state regulations had the purpose or effect of placing substantial

12.

obstacles in the path of a woman seeking an abortion. The undue burden standard has been recognized as the "appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." *Id.* at 876. A state regulation which has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus creates an undue burden and is invalid. *Id.* at 877. However, a law which has a valid purpose and "the incidental effect of making it more difficult or more expensive to procure an abortion," does not impose an undue burden. *Id.* at 874. "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Id.*

{¶ 18} While the undue burden test set forth in *Casey* has traditionally been applied to abortion-specific regulations, courts have found the undue burden test also applies to neutral regulations which effect abortion facilities. *See Women's Medical Professional Corp. v. Baird*, 438 F.3d 595, 603 (6th Cir.2006); *Planned Parenthood of Greater Iowa, Inc. v. Atchison*, 126 F.3d 1042, 1049 (8th Cir.1997). It has been held that "'the constitutional inquiry in an as-applied challenge is limited to the plaintiff's particular situation,' * * * and therefore, we must consider the context in which the challenge to the regulation arises." *Baird* at 603, citing *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir.1997).

{¶ 19} Additionally, it has been held that a state is not permitted to "lean on its sovereign neighbors to provide protection of its citizens' federal constitutional rights."

13.

*Jackson Women's Health Organization v. Currier*, 760 F.3d 448, 457 (5th Cir.2014). In

*Currier*, the circuit court ruled that a Mississippi state law requiring physicians to obtain

admitting privileges at local hospitals constituted an undue burden on a woman's right to

procure an abortion in Mississippi. *Id.* at 459. The state had argued that although the law

would close the remaining abortion clinic in Mississippi, an undue burden under *Casey*

would not be created due to abortion clinics to which patients could travel in the

neighboring states of Louisiana and Tennessee. *Id.* at 455. The court considered whether

the availability of abortion clinics in neighboring states should be taken into account in

the undue burden analysis. *Id*. In rejecting the state's argument, the court relied on *State

of Missouri ex rel. Gaines v. Canada,* 305 U.S. 337, 350, 59 S.Ct. 232, 83 L.Ed.208

(1938), which set forth:

> the obligation of the State to give the protection of equal laws can be
>
> performed only where its laws operate, that is, within its own jurisdiction.
>
> * * * That obligation is imposed by the Constitution upon the States
>
> severally as governmental entities -- each responsible for its own laws
>
> establishing the rights and duties of persons within its borders. It is an
>
> obligation the burden of which cannot be cast by one State upon another,
>
> and no State can be excused from performance by what another State may
>
> do or fail to do. That separate responsibility of each State within its own
>
> sphere is of the essence of statehood maintained under our dual system. *Id.*

14.

**Burdens Compared to Benefits**

{¶ 20} Hardships to women seeking abortions, such as a 24-hour waiting period with its associated increased travel time, have been held to not constitute an undue burden. *Casey* at 886.

{¶ 21} However, recently, the United States Supreme Court, in *Whole Woman's Health v. Hellerstedt*, 579 U. S. ___, 195 L.Ed.2d 665, 689 (2016), set forth a more exacting undue burden standard, where combined burdens to patients seeking abortions are weighed against the health benefits of a regulation to determine whether an undue burden exists.

{¶ 22} In *Hellerstedt*, the court scrutinized two new Texas laws, one of which required a "physician performing or inducing an abortion * * * on the date the abortion is performed or induced, have active admitting privileges at a hospital that * * * is located not further than 30 miles from the location at which the abortion is performed or induced." *Id.* at 686. The United States Supreme Court affirmed the district court's finding that this new Texas law "imposed an 'undue burden' on a woman's right to have an abortion." *Id.*

{¶ 23} The court noted the "purpose of the admitting-privileges requirement is to help ensure that women have easy access to a hospital should complications arise during an abortion procedure." *Id.* at 686-687. However, the court "found nothing in Texas' record evidence that shows that, compared to prior law (which required a 'working

15.

arrangement' with a doctor with admitting privileges), the new law advanced Texas' legitimate interest in protecting women's health." *Id.* at 687.

{¶ 24} The court further observed as a result of this new Texas law, about half of the facilities providing abortions in the state closed. *Id.* at 688. "Those closures meant fewer doctors, longer waiting times, and increased crowding" as well as increased driving distances to clinics. *Id.* at 689. The court found "[i]ncreased driving distances do not always constitute an 'undue burden,' but they are an additional burden," and when combined with other burdens and "viewed in light of the virtual absence of any health benefits" of a regulation, an undue burden finding can be supported. *Id.*

{¶ 25} Here, we note the trial court properly found the undue burden framework set forth in *Casey* applied to its constitutional inquiry of whether the licensing provisions created a substantial obstacle for a woman seeking an abortion. While the trial court did not provide any further examination under the undue burden framework, perhaps because the parties focused their arguments on other matters and very limited evidence was presented with regards to the undue burden issue, we find it necessary to analyze whether the licensing provisions are violative of the undue burden standard.

{¶ 26} The record shows Capital Care is the sole abortion clinic remaining in northwest Ohio. Capital Care's patients are from Ohio, Michigan, Indiana and West Virginia. Another abortion provider, the Center for Choice, which was located in downtown Toledo, closed in June of 2013. Following the closing of the Center for

16.

Choice, an additional 30 to 50 women per month from Toledo and other parts of Ohio have sought services at Northland Family Planning Centers in the Detroit, Michigan area.

{¶ 27} If Capital Care were to close due to its failure to strictly adhere to the WTA requirement or to secure a variance to that requirement, Capital Care's patients would be required to find another clinic. The nearest clinics to Capital Care are located in Cleveland, Columbus and the Detroit, Michigan area.[1] These patients would have to travel a further distance to one of these alternate clinics to consult with doctors and their staff and obtain services.

{¶ 28} The additional burdens brought about if Capital Care were to close will be considered alongside the purported health benefits of the licensing provisions.

{¶ 29} With respect to the burdens, locating an alternate clinic and traveling to an alternate clinic which is further away are two additional burdens Capital Care patients would experience if Capital Care were forced to close. Other additional burdens these patients would face include incurring extra travel expenses and expending additional time in reaching the alternate clinic. These patients may also be subjected to the additional burden of greater anxiety and apprehension in having to obtain abortion services in a strange locality with unfamiliar staff and doctors. What is more, the influx of these patients to alternate clinics may be onerous and burdensome to the existing patient base,

---

[1]While we recognize the closest clinic to northwest Ohio is located in the state of Michigan, consideration of this clinic is not inconsistent with *Currier*, as there are other clinics which still remain in Ohio.

17.

such that it may take patients longer to get an appointment or see a doctor or staff member. Patient care may well suffer too, as a result of the arrival of additional patients at the alternate clinics. Patients could receive less attention or compromised treatment as a consequence of the increased number of patients the doctors and staff must assist.

{¶ 30} Regarding the purported health benefits of the licensing provisions, the record shows Dr. Theodore Wymyslo, the former director of the ODH, when asked why WTAs "are important from a safety perspective for the patient's safety," explained "if a patient has a problem, there is already a preordained method by which the patient is transferred. We want to make sure that their information accompanies the patient wherever they go to deal with the problem." The doctor opined having a prearranged understanding with an organization is "very different from a public citizen just walking in off the street." He noted even if the patient is not at the ASF and a complication arises, the patient would be directed to go to the WTA hospital for care. The doctor acknowledged, however, that the patient would have the choice to go wherever the patient would want to go; ASFs can advise patients, but patients make their own decisions. The doctor further admitted R.C. 3702.303 requires the transfer agreement from the facility to the hospital, not from the patient's home or place of work to the hospital. When Dr. Wymyslo was asked why calling 911 was not an adequate solution for an emergency situation, he recognized all hospital emergency rooms are required to do a medical assessment and treatment when an emergency patient comes in, but what happens after that is not clearly defined.

18.

**{¶ 31}** Terry Hubbard noted in the 12 years in which she has worked at or owned Capital Care, there has never been the need to transfer a patient to the hospital. Nevertheless, Ms. Hubbard developed a policy in case a patient did need to be transferred from Capital Care to the hospital at the University of Michigan. Ms. Hubbard also observed that if any emergency arose at Capital Care, 911 would be called and an ambulance would immediately respond and transport the patient to the nearest hospital.

**{¶ 32}** Upon review, the record does not establish how and why it is advantageous to a patient to have a WTA in place. First, R.C. 3702.303 only requires SFAs have a WTA "with a local hospital that specifies an effective procedure for the safe and immediate transfer of patients from the facility to the hospital when medical care beyond the care that can be provided" at the ASF is necessary. There is absolutely no requirement in the law for the transfer of a patient from the patient's home or place of work to the hospital. Second, the record clearly demonstrates that if a patient at Capital Care or any ASF has a medical emergency, 911 is called and an ambulance transports the patient to the nearest hospital for assessment and treatment. Last, and most important, the need to transport a patient from Capital Care to a hospital for treatment is just about nonexistent; the record reveals the need has not arisen in the past 12 years. Therefore the necessity for a WTA is tenuous, at best.

**{¶ 33}** The many hardships which will or may occur if Capital Care were forced to close have the effect of creating substantial obstacles in the path of a woman seeking an abortion. These combined burdens weighed against the virtually nonexistent health

benefits of the licensing provisions as applied to Capital Care are violative of the undue burden standard. Our undue burden finding is fully in agreement with the conclusion reached in *Hellerstedt*.

## Unconstitutional Delegation of Authority

{¶ 34} "[T]he law-making prerogative is a sovereign power conferred by the people upon the legislative branch of the government * * * and cannot be delegated to other officers, board or commission, or branch of government." *Matz v. J. L. Curtis Cartage Co.*, 132 Ohio St. 271, 279, 7 N.E.2d 220 (1937). However, the General Assembly of Ohio "may confer administrative power on an executive, a board or commission." *Id.*

> As a general rule a law which confers discretion on an executive officer or board without establishing any standards for guidance is a delegation of legislative power and unconstitutional; but when the discretion to be exercised relates to a police regulation for the protection of the public morals, health, safety or general welfare, and it is impossible or impracticable to provide such standards, and to do so would defeat the legislative object sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations. *Id.* at paragraph seven of the syllabus.

Nonetheless, a state is not authorized to grant a third party the absolute right to veto the decision of a physician and patient for the patient to have an abortion. *Planned*

20.

*Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

{¶ 35} The trial court relied heavily on the ruling in *Women's Medical Professional Corp. v. Baird*, 438 F.3d 595 (6th Cir.2006), in determining that the licensing provisions contained an unconstitutional delegation of authority. *Baird* was also an abortion case but it addressed certain statutes enacted prior to H.B. 59. The abortion facility tried but was unable to secure a WTA with an area hospital. *Id.* at 599. The facility therefore requested from the director of the ODH a waiver of the WTA requirement. *Id.* at 599-600. Baird, ODH's director, denied the waiver request. *Id.* at 600. The facility appealed. The district court reversed Baird's decision, finding the WTA created "'an undue burden and a substantial obstacle for women seeking abortions'" and the law as applied violated procedural due process rights. *Id.* at 602. Director Baird appealed. The appellate court reversed, ruling that since Baird retained the authority to grant a waiver of the transfer agreement requirement, the state was allowed to make the final decision and there was no impermissible delegation of authority to a third party. *Id.* at 610.

{¶ 36} Here, unlike *Baird*, the licensing provisions include the unconstitutional delegation of licensing authority to hospitals and physicians. The trial court properly distinguished how the laws in *Baird* were different from the licensing provisions by underscoring how the discretion held by Director Baird removed the possibility of hospitals and physicians exercising final veto power. *Id.* at 610.

21.

{¶ 37} Under R.C. 3702.304, which sets forth the variance procedure from the WTA requirement, a variance application is not complete without a letter signed by a physician, and a physician who signs such a letter must inform each hospital at which the physician has admitting privileges. R.C. 3702.304(B)(2) and (3)(e). This indirect authority to physicians and hospitals allows them to decide whether or not to provide letters to SFAs which perform abortions, and permits the granting of WTAs or denial of variances from WTAs based on unpredictable and uncertain reasoning rather than guided and lawful standards. A physician may not want to sign the letter for an abortion provider, or the hospital where the doctor has privileges may preclude the doctor from signing such a letter. Even physicians who are able to sign the variance may still refuse to do so due to hostility that these physicians could face. *See Hellerstedt*. R.C. 3702.304 grants hospitals and physicians powers which the state itself does not possess. *See Hallmark Clinic v. North Carolina*, 380 F.Supp. 1153, 1158-1159 (E.D.N.C.1974). This delegation of authority gives hospitals and doctors the opportunity to fill any void that the licensing provisions, which prohibits state-funded hospitals from entering into WTAs with abortion providers, did not fill. This could effectively eliminate the opportunity of women to seek and obtain abortion procedures in northwest Ohio. We find this delegation of authority unconstitutional, as did the trial court.

## Single-Subject Rule

{¶ 38} The single-subject requirement provides "no bill shall contain more than one subject, which shall be clearly expressed in its title." Article II, Section 15(D), Ohio

22.

Constitution. "By limiting each bill to one subject, the issues presented can be better grasped and more intelligently discussed." *State ex rel. Dix v. Celeste*, 11 Ohio St.3d 141, 142-143, 464 N.E.2d 153 (1984). This is especially important when the issue is "inherently controversial and of significant constitutional importance." *Simmons-Harris v. Goff*, 86 Ohio St.3d 1, 16, 711 N.E.2d 203 (1999).

{¶ 39} The single-subject requirement is primarily in place to prevent the "unnatural combinations of provisions" into an omnibus bill. *Dix* at 142-143. This practice is known as logrolling. *Id.* at 143. However, a bill which embraces more than one topic does not unquestionably violate the one-subject rule. *Hoover v. Bd. of Cty. Commrs., Franklin Cty.*, 19 Ohio St.3d 1, 6, 482 N.E.2d 575 (1985). As long as a discernible relationship or common purpose exists between the provisions, and it cannot be inferred that the bill is for the purpose of logrolling, the enactment may still be upheld. *Id.* Courts should take a limited role in enforcing the single-subject requirement in order to avoid undue interference with the purpose of legislation. *State ex rel. Ohio Civ. Serv. Employees Assn., AFSCME, Local 11, AFL-CIO v. State. Emp. Relations Bd.*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 27. A legislative enactment is in violation of the single-subject rule "only when a violation of the rule is manifestly gross and fraudulent." *Beagle v. Walden*, 78 Ohio St.3d 59, 62, 676 N.E.2d 506 (1997).

{¶ 40} H.B. 59, titled "Appropriations - Fiscal Year 2014-2015 State Budget," primarily deals with appropriations for state expenditures. ODH relies on *Ohio Civ. Serv. Employees Assn.* for the proposition that appropriation bills are different from other acts

23.

due to the broad range of items appropriation bills may encompass. *Id.* at ¶ 30. While it is undeniable the potentially unlimited range of material appropriation bills can cover, this alone is not sufficient to allow for any provision incorporated in an appropriation bill to be valid under the one-subject requirement. *Id.* According to the *Ohio Civ. Serv. Employees Assn.* court, allowing provisions that are bound solely because they are appropriations renders the one-subject rule meaningless. *Id.* at ¶ 33. *See also Cleveland v. State*, 2013-Ohio-1186, 989 N.E.2d 1072*,* ¶ 51 (8th Dist.). The *Ohio Civ. Serv. Employees Assn.* court also took into consideration the lack of any explanation as to how the statute, which excluded certain employees from collective-bargaining, was related to the budget-related items. *Id*. at ¶ 34.

{¶ 41} ODH's argument is analogous to that presented in *Cleveland*, where the court determined that *in theory* provisions which essentially eliminate municipal police powers could only *potentially* impact budgets of municipalities. *Cleveland* at ¶ 52. The court rejected "the concept that such a tenuous, tangential link can serve as the unifying thread" between the statute's provisions and the appropriation bill. *Id.*

{¶ 42} Similar to the reasoning set forth in *Ohio Civ. Serv. Employees Assn.* and *Cleveland*, we must find, as did the trial court, that the licensing provisions are in violation of the single-subject rule. The link between the bulk of H.B. 59, which primarily concerns the appropriation of state funds, and the provisions for licensing abortion facilities, is difficult, at best, to discern. The inclusion of the licensing provisions in the budget bill is a clear example of logrolling—the "unnatural

24.

combinations of provisions." In addition, merely because the licensing provisions are tied to the appropriation bill does not shield the licensing provisions from the one-subject requirement. This is particularly evident here given ODH's failure to proffer any explanation as to how licensing provisions aligns with the bulk of H.B. 59. Accordingly, we observe no common nexus between the licensing provisions and the budget-related items in H.B. 59. We therefore find the licensing provisions in H.B. 59 unconstitutional as contrary to the single-subject rule of the Ohio Constitution.

## Conclusion

{¶ 43} We find the sole assignment of error of the ODH not well-taken. We further find R.C. 3702.303, 3702.304 and 3727.60 unconstitutional.

{¶ 44} The judgment of the Lucas County Court of Common Pleas is affirmed. ODH is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J._____

Arlene Singer, J._____

James D. Jensen, P.J._____
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.