**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Capital Care Network of Toledo v. Dept. of Health,* **Slip Opinion No. 2018-Ohio-440.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-440

CAPITAL CARE NETWORK OF TOLEDO, APPELLEE, *v.* OHIO DEPARTMENT OF HEALTH, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Capital Care Network of Toledo v. Dept. of Health,* Slip Opinion No. 2018-Ohio-440.]**

*Ohio Adm.Code.3701-83-19(E)—R.C.119.12—Revocation of ambulatory-surgical-facility license for failure to have a written transfer agreement by Ohio Department of Health supported by reliable, probative, and substantial evidence and in accordance with law—Agreement with a hospital 52 miles away rather than nearby hospital does not allow for the transfer of patients "in the event of medical complications, emergency situations, and for other needs as they arise."*

(No. 2016-1348—Submitted September 12, 2017—Decided January 24, 2018.*)

APPEAL from the Court of Appeals for Lucas County,

No. L-15-1186, 2016-Ohio-5168.

————————————

*Reporter's Note: This cause was decided on January 24, 2018, but was released to the public on February 6, 2018, subsequent to the resignation of Justice William M. O'Neill, who participated in the decision.

**SYLLABUS OF THE COURT**

The order of the Ohio Department of Health revoking the health care facility license
of Capital Care Network of Toledo is supported by reliable, probative, and
substantial evidence and is in accordance with law because Capital Care
operated without a written transfer agreement for a period of five months
and its subsequent agreement with the University of Michigan does not
satisfy the Ohio Administrative Code requirement to establish and maintain
written transfer agreements for patients in emergency situations.

_____

**O'DONNELL, J.**

{¶ 1} This matter raises important issues that impact constitutional rights.
The case has been thoroughly briefed, well-argued, and presents single subject and
due process challenges to provisions the legislature enacted as part of 2013
Am.Sub.H.B. No. 59 ("H.B. 59"), a biennial budget bill, which arguably impede
rights guaranteed to women as declared by the United States Supreme Court in *Roe
v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

{¶ 2} But in the last analysis, this appeal involves a policy decision made
by the legislative department of government in vesting the authority to license
ambulatory surgical facilities in the Ohio Department of Health ("ODH") and in
defining the scope of judicial review of its decisions. Adhering to the doctrine of
separation of powers, we address the legal issue presented to our court, which
concerns whether the order of the director of the Department of Health for the state
of Ohio revoking the license of Capital Care Network of Toledo for failure to
comply with Ohio Adm.Code 3701-83-19(E) is supported by reliable, probative,
and substantial evidence and is in accordance with law.

{¶ 3} Since 1996, ODH regulations have required ambulatory surgical
facilities in Ohio to have a written transfer agreement with a hospital to facilitate
treatment in the event of an emergency or an urgent complication beyond the

2

capability of the facility. ODH interprets Ohio Adm.Code 3701-83-19(E) to require ambulatory surgical facilities to have a written transfer agreement with a nearby hospital—specifically, a hospital within 30 minutes' transport from the facility. In 2013, the General Assembly codified the rule in R.C. 3702.303(A), expressly requiring written transfer agreements to be negotiated with local hospitals.

{¶ 4} Capital Care operated with a negotiated written transfer agreement with the University of Toledo Medical Center but in April 2013, the university advised Capital Care that it would not renew its contract, which expired on July 31, 2013. Capital Care continued operating without an agreement until January 20, 2014, when it negotiated a new transfer agreement with the University of Michigan Health System to transfer patients to its hospital in Ann Arbor, Michigan, 52 miles from Capital Care's Toledo facility. ODH held an administrative hearing and as a result revoked and refused to renew Capital Care's health care facility license based on its violation of both R.C. 3702.303(A) and Ohio Adm.Code 3701-83-19(E).

{¶ 5} On Capital Care's administrative appeal, the Lucas County Common Pleas Court reversed the license revocation, finding R.C. 3702.303(A) unconstitutional and the revocation contrary to law. The Sixth District Court of Appeals affirmed, holding that R.C. 3702.303(A) and related statutes violate the Single Subject Clause of Article II, Section 15(D) of the Ohio Constitution, unlawfully delegate licensing authority to private parties, and impose an undue burden on obtaining an abortion.

{¶ 6} Neither court, however, examined the authority of ODH to revoke Capital Care's license for operating without a valid written transfer agreement in violation of Ohio Adm.Code 3701-83-19(E). In this case, the order of the Ohio Department of Health revoking the health care facility license of Capital Care Network of Toledo is supported by reliable, probative, and substantial evidence and is in accordance with law because Capital Care operated without a written transfer agreement for a period of five months and its subsequent agreement with the

University of Michigan does not satisfy the Ohio Administrative Code requirement to establish and maintain written transfer agreements for patients in emergency situations.

{¶ 7} Accordingly, we reverse the judgment of the court of appeals and reinstate the decision of the Ohio Department of Health.

**Facts and Procedural History**

{¶ 8} Capital Care is an ambulatory surgical facility located in Toledo, Ohio, that provides abortion services. All ambulatory surgical facilities in Ohio are required by statute to obtain a health care facility license from ODH, conditioned on compliance with quality standards established by ODH. R.C. 3702.30(A)(4)(a), (B), (D), and (E)(1).

{¶ 9} Ohio Adm.Code 3701-83-19(E) establishes that each ambulatory surgical facility "shall have a written transfer agreement with a hospital for transfer of patients in the event of medical complications, emergency situations, and for other needs as they arise." The regulations further authorize ODH to grant "a variance or waiver from any building or safety requirement established by Chapter 3701-83 of the Administrative Code, unless the requirement is mandated by statute." Ohio Adm.Code 3701-83-14(A).

{¶ 10} In 2010, Terrie Hubbard purchased Capital Care, which had been licensed as an ambulatory surgical facility by ODH. In August 2012, she obtained a written transfer agreement with the University of Toledo Medical Center. However, in April 2013, the university informed Hubbard and ODH that it would not renew the written transfer agreement with Capital Care, and it expired on July 31, 2013.

{¶ 11} On July 30, 2013, ODH inquired whether Capital Care had negotiated a new written transfer agreement, but Capital Care did not respond. ODH inspected the facility on August 1, 2013, and discovered that Capital Care had neither a written transfer agreement nor a written plan for complying with Ohio

Adm.Code 3701-83-19(E). The next day, ODH Director Theodore E. Wymyslo, M.D., issued notice of his intent to revoke and refuse to renew Capital Care's health care facility license. ODH granted Capital Care a hearing but continued it on the ODH director's motion.

{¶ 12} Thereafter, effective September 29, 2013, the General Assembly codified the written transfer agreement rule when it enacted R.C. 3702.303 as part of the biennial budget bill, H.B. 59, requiring ambulatory surgical facilities to have

> a written transfer agreement with a local hospital that specifies an effective procedure for the safe and immediate transfer of patients from the facility to the hospital when medical care beyond the care that can be provided at the ambulatory surgical facility is necessary, including when emergency situations occur or medical complications arise.

The statute further permits the ODH director to grant a variance from the written transfer agreement requirement pursuant to R.C. 3702.304(A) if that requirement would cause undue hardship, the variance would not jeopardize the health and safety of any patient, and the facility has an agreement with a physician who has admitting privileges at a local hospital to provide back-up coverage. H.B. 59 also enacted R.C. 3727.60(B), which prohibits public hospitals from entering into written transfer agreements with facilities performing nontherapeutic abortions or from authorizing a doctor to use the doctor's staff privileges to support a variance application.

{¶ 13} Capital Care never sought a waiver or variance of the written transfer agreement requirement pursuant to either the rule or the statute. Rather, on January 20, 2014, it entered into a written transfer agreement with the Regents of the

University of Michigan on behalf of the University of Michigan Health System in Ann Arbor, Michigan, 52 miles from Capital Care.

{¶ 14} On February 18, 2014, Dr. Wymyslo again issued notice of his intent to revoke and refuse to renew Capital Care's health care facility license, explaining that "[t]he written transfer agreement violates the R.C. 3702.303(A) requirement that the written transfer agreement be with a local hospital."

{¶ 15} ODH conducted a hearing encompassing both the August 2, 2013 and February 18, 2014 notices. Dr. Wymyslo explained that the written transfer agreement requirement exists to protect the health of patients in the event of an emergency or urgent complication beyond the capability of the ambulatory surgical facility to handle by ensuring that the facility has made advance arrangements to transfer the patient and the patient's records to a hospital. He noted that transfer to a hospital through its emergency room decreases the quality of care because it "wastes valuable hours of time" if the emergency room staff has "to reconstruct what happened [and] learn past information" and admission to the hospital is not prearranged. Dr. Wymyslo pointed out that the written transfer agreement makes admission and treatment "faster and more efficient and [provides] better quality care."

{¶ 16} Based on his experience credentialing physicians providing emergency- and urgent-care backup at Miami Valley Hospital, Dr. Wymyslo testified that his expectation was that a written transfer agreement needs to be with a hospital within 30 minutes' transport from the facility in order to effectively provide for treatment in the event of emergencies and urgent complications. He explained that "anything more than a 30-minute time period becomes a patient safety and quality of care concern" and that "every hospital in Ohio" has used 30 minutes when they credential physicians as "a reasonable period of time in which an individual should have access to emergency intervention." Dr. Wymyslo described this 30-minute period as what is "reasonable, customary and in the best

interest of the patient," in responding to emergencies and urgent complications. He also clarified that ODH had relied on the same 30-minute standard in reviewing written transfer agreements both before and after R.C. 3702.303(A) required them to be with local hospitals. And based on the 52-mile distance from Capital Care to the University of Michigan Health System, he decided that "clearly this was going to be a greater than 30-minute period of time between the time of an emergency arising and the time that they could access care in this facility."

{¶ 17} Hubbard, Capital Care's owner, testified that she had been unable to obtain a written transfer agreement with any Toledo hospital, and she indicated that in the event of an emergency, the clinic's staff would call 9-1-1 and the fire department would transport the patient to Toledo Hospital, the closest hospital, regardless of whether the facility had a written transfer agreement with a different hospital. Further, she explained, patients with complications that were not emergencies would be transported to Ann Arbor by helicopter or ambulance. Although she claimed that flight time to Ann Arbor from the facility was 15 to 20 minutes, she admitted that it would take approximately 50 to 60 minutes for a helicopter to reach the facility from its base in Licking County. She also admitted that she had no contract with the air-ambulance provider to ensure that a helicopter would be available when needed.

{¶ 18} The hearing examiner found that Capital Care had operated for more than five months without a written transfer agreement in violation of Ohio Adm.Code 3701-83-19(E) and that the written transfer agreement it subsequently obtained was not with a local hospital, in violation of R.C. 3702.303(A), and he concluded that "the Director's August 02, 2013 and February 18, 2014 decisions to not renew, or to revoke the license of Capital Care, are valid." ODH's interim director, Lance D. Himes, approved the hearing examiner's report and recommendation and issued an adjudication order on July 29, 2014, revoking and

refusing to renew Capital Care's health care facility license "in accordance with R.C. 3702.32, 3702.303(A), R.C. Chapter 119, and OAC 3701-83-19(E)."

*Capital Care Appeals the License Revocation*

**{¶ 19}** Capital Care appealed the adjudication order to the Lucas County Common Pleas Court pursuant to R.C. Chapter 119, and that court reversed, concluding that although ODH had reasonably determined that Capital Care lacked a written transfer agreement with a "local" hospital, enacting R.C. 3702.303, 3702.304, and 3727.60(B) in the biennial budget bill violated the Single Subject Clause of Article II, Section 15(D) of the Ohio Constitution, and these statutes amounted to an unconstitutional delegation of licensing authority to private entities, imposing an undue burden on women seeking an abortion.

**{¶ 20}** The Sixth District Court of Appeals affirmed the trial court, holding that in accord with *Whole Woman's Health v. Hellerstedt*, 579 U. S. ___, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016), the statutory mandate for a written transfer agreement and the statutory prohibition against public hospitals entering into written transfer agreements with abortion clinics imposed an undue burden on obtaining an abortion, because the "virtually nonexistent health benefits" of requiring a transfer agreement did not outweigh the "substantial obstacles in the path of a woman seeking an abortion." 2016-Ohio-5168, 58 N.E.3d 1207, ¶ 33. It further concluded that R.C. 3702.304 delegated licensing authority to private parties because it only permitted a variance from the written transfer agreement requirement if the facility obtained an agreement with a physician who had admitting privileges at a local, private hospital. And lastly, it concluded that R.C. 3702.303, 3702.304, and 3727.60 violate the Single Subject Clause because there is no common nexus with the budget-related items in H.B. 59.

*Arguments before the Ohio Supreme Court*

**{¶ 21}** On appeal to this court, ODH urges that the court need not address the constitutional issues presented in this case, because the transfer agreement with

the University of Michigan Health Center in Ann Arbor does not comply with Ohio Adm.Code 3701-83-19(E), and therefore, the order revoking Capital Care's license is supported by reliable, probative, and substantial evidence and is in accordance with the law. It also contends: (1) the provisions related to ambulatory surgical facilities enacted in H.B. 59 do not violate the Single Subject Clause, (2) Capital Care disclaimed the argument that the written transfer agreement statute imposes an undue burden on abortion rights, and in any case, the statute is rationally related to protecting the health of women having abortions, and (3) the statute does not unconstitutionally delegate licensing authority to third parties because ODH has the final decision with respect to granting a variance.

{¶ 22} Capital Care argues that ODH did not rely on Ohio Adm.Code 3701-83-19(E) but rather concluded that the written transfer agreement did not comply with R.C. 3702.303(A). It asserts that the statute and the rule impose different standards but only the statute required the agreement to be with a local hospital, and it maintains that its written transfer agreement complies with the rule by providing for emergency transfers to a local hospital using 9-1-1 and non-emergency transfers to Ann Arbor via helicopter or ground transport. Capital Care further contends that had it known that its agreement needed to but did not comply with the rule, it would have sought a waiver or a variance, and that principles of procedural due process preclude ODH from now using the rule to revoke the license when it never provided notice that the Michigan transfer agreement did not comply with that rule. It also contends that (1) enacting regulations on ambulatory surgical facilities disconnected from appropriations in the biennial budget bill violates the Single Subject Clause, (2) the court of appeals correctly concluded that R.C. 3702.303, 3702.304, and 3727.60 impose an undue burden on abortion rights after the Supreme Court's intervening decision in *Hellerstedt* rendered ODH's revocation of its license contrary to law, and (3) those statutes unconstitutionally delegate the state's licensing authority to private parties by giving privately owned

hospitals and physicians the arbitrary power to veto the licensing and operation of abortion providers by refusing to contract with them.

**{¶ 23}** The legal question presented here is whether the order of ODH revoking Capital Care's health care facility license is supported by reliable, probative, and substantial evidence and is in accordance with law.

**Law and Analysis**

**{¶ 24}** The standard of review for an appeal to common pleas court from an administrative order revoking or denying renewal of a license is contained in R.C. 119.12(M), which specifies that the court may affirm the order if it is "supported by reliable, probative, and substantial evidence and is in accordance with law."

**{¶ 25}** In *University of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 407 N.E.2d 1265 (1980), we indicated that "whether an agency order is supported by reliable, probative and substantial evidence essentially is a question of the absence or presence of the requisite quantum of evidence." *Id.* at 111. We then explained that an administrative appeal to the common pleas court does not provide a trial de novo, *id.* at 110, but rather "the Court of Common Pleas must give due deference to the administrative resolution of evidentiary conflicts," *id.* at 111. And where the agency's decision is supported by sufficient evidence and the law, the common pleas court lacks authority to review the agency's exercise of discretion, even if its decision is "admittedly harsh." *Henry's Cafe, Inc. v. Bd. of Liquor Control*, 170 Ohio St. 233, 236-237, 163 N.E.2d 678 (1959).

**{¶ 26}** Ohio Adm.Code 3701-83-05.1(C)(2) permits ODH to "[r]evoke, suspend, or refuse to renew" a health care facility license if it determines that the facility "is not complying" with any provision of Ohio Adm.Code Chapter 3701-83, which includes the requirement that an ambulatory surgical facility have "a written transfer agreement with a hospital for transfer of patients in the event of medical complications, emergency situations, and for other needs as they arise," Ohio Adm.Code 3701-83-19(E).

{¶ 27} Both before and after the enactment of R.C. 3702.303(A), the director of ODH interpreted Ohio Adm.Code 3701-83-19(E) to require ambulatory surgical facilities to have a written transfer agreement with a hospital within a 30-minute transport from the facility. Dr. Wymyslo testified that 30 minutes is the reasonable and customary time for transporting a patient to the hospital in the event of an emergency or urgent complication and that anything more than 30 minutes threatens patient safety and quality of care.

{¶ 28} The evidence adduced at the administrative hearing supports the director's finding that the agreement with the Ann Arbor hospital did not comport with the administrative rule's requirement of a written transfer agreement "for transfer of patients *in the event of medical complications, emergency situations, and for other needs as they arise*." (Emphasis added.) Ohio Adm.Code 3701-83-19(E). Because the rule provides for the transfer of patients *in emergency situations*, it anticipates that the patient will be quickly transported to a nearby hospital for emergency treatment rather than taken to one further away over a longer period of time. The testimony established that the Ann Arbor agreement would not have allowed for the effective transfer and treatment of a patient in an emergency situation. Hubbard admitted that Capital Care lacked a written transfer agreement with any hospital between August 1, 2013, and January 20, 2014. She also testified that the University of Michigan Health System in Ann Arbor is 52 miles from her facility in Toledo, and although she suggested that a helicopter could be used to transfer patients there, she admitted that she had no contract with an air-ambulance provider to ensure that one would be available when needed. Even if one were available, she admitted it could take an hour for it to reach her facility before flying another 15 to 20 minutes to Ann Arbor. In short, the evidence plainly established that the Ann Arbor agreement would not allow for the transfer of patients "in the event of medical complications, emergency situations, and for other needs as they arise." ODH's determination that Capital Care did not comply with Ohio

Adm.Code 3701-83-19(E) was supported by reliable, probative, and substantial evidence.

{¶ 29} Capital Care's argument that deciding this case by applying the administrative rule violates due process is without merit. Importantly, Capital Care has maintained throughout these proceedings that its agreement with the University of Michigan Health System *complies* with the rule, and it did not seek a variance or a waiver of the rule's written transfer agreement requirement even during the extended period in which it operated without any written transfer agreement. Thus, its claim that it has now been denied due process by being deprived of the opportunity to seek a variance or a waiver is not well taken, because it never believed it needed one in the first instance, did not pursue a variance or waiver, and thus has not been denied that opportunity. In addition, it has never questioned the applicability or constitutionality of Ohio Adm.Code 3701-83-19(E), and in *Women's Med. Professional Corp. v. Baird*, 438 F.3d 595 (6th Cir.2006), the Sixth Circuit Court of Appeals held that applying the rule's written transfer agreement requirement to a Dayton abortion clinic did not impose an undue burden on abortion rights, *id*. at 609, or constitute an unconstitutional delegation of licensing authority to a third party, *id*. at 610.

{¶ 30} Accordingly, ODH's finding that Capital Care is not complying with Ohio Adm.Code 3701-83-19(E) is supported by reliable, probative, and substantial evidence and is in accordance with law. Capital Care operated without a written transfer agreement for five months and currently has no such agreement with a hospital that allows for the transfer of patients in the event of emergency situations. These violations permitted ODH to revoke Capital Care's health care facility license pursuant to rule.

{¶ 31} And contrary to the approach of the court of appeals reaching the constitutionality of R.C. 3702.303, 3702.304, and 3727.60, our precedent directs that "this court will not reach constitutional issues unless absolutely necessary."

12

*State v. Talty*, 103 Ohio St.3d 177, 2004-Ohio-4888, 814 N.E.2d 1201, ¶ 9; *In re Miller*, 63 Ohio St.3d 99, 110, 585 N.E.2d 396 (1992). And our long-standing practice disfavors issuing advisory opinions. *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, ¶ 27; *Egan v. Natl. Distillers & Chem. Corp.*, 25 Ohio St.3d 176, 495 N.E.2d 904 (1986), syllabus. As Chief Justice Roberts has stated, "[I]f it is not necessary to decide more, it is necessary not to decide more." *PDK Laboratories, Inc. v. United States Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C.Cir.2004) (Roberts, J., concurring in part and concurring in judgment). We thus decline to address the constitutional issues in this case, because revocation of Capital Care's license is supported by reliable, probative, and substantial evidence and is in accordance with law.

## Conclusion

{¶ 32} For more than two decades, Ohio Adm.Code 3701-83-19(E) has required ambulatory surgical facilities in Ohio to have written transfer agreements with hospitals in order to facilitate treatment in the event of medical complications, emergency situations, and for other needs as they arise.

{¶ 33} The record here demonstrates that Capital Care violated Ohio Adm.Code 3701-83-19(E) by operating without any written transfer agreement between August 1, 2013, and January 20, 2014, and without a written transfer agreement that allows for the transfer of patients in the event of emergency situations after January 20, 2014. Thus, this appeal is a license revocation case based on the failure to comply with an administrative rule, and the order of ODH revoking and refusing to renew Capital Care's health care facility license pursuant to Ohio Adm.Code 3701-83-05.1(C)(2) and 3701-83-19(E) is supported by reliable, probative, and substantial evidence and is in accordance with law.

{¶ 34} Instead of reviewing the basis of the revocation, the appellate court jumped to constitutional questions, concluding that R.C. 3702.303, 3702.304, and 3727.60 violate the Single Subject Clause and delegate licensing authority to third

parties—and without the benefit of briefing or argument, it also held that these statutes impose an undue burden on abortion rights. However, because ODH had authority to revoke Capital Care's license based on the failure to comply with the administrative rule requiring a written transfer agreement with a nearby hospital, it is not necessary to reach those constitutional issues.

**{¶ 35}** Accordingly, we reverse the judgment of the court of appeals and reinstate the order of the Ohio Department of Health revoking and refusing to renew the license of Capital Care Network of Toledo.

Judgment reversed.

KENNEDY, FISCHER, and DEWINE, JJ., concur.

FRENCH, J., concurs, with an opinion joined by KENNEDY and DEWINE, JJ.

O'CONNOR, C.J., dissents, with an opinion joined by O'NEILL, J.

—————————

**FRENCH, J., concurring.**

**{¶ 36}** I agree with the majority that appellant, Ohio Department of Health ("ODH"), lawfully revoked the operating license of appellee, Capital Care Network of Toledo ("Capital Care"), because Capital Care did not have a transfer agreement with a hospital as required by Ohio Adm.Code 3701-83-19(E). As stated by the majority, we need not address the constitutionality of R.C. 3702.303, 3702.304, and 3727.60 because the administrative rule provided an alternative and independent basis for ODH to revoke Capital Care's license.

**{¶ 37}** I write separately, however, to address the dissent's contention that the statutes violate the one-subject rule of the Ohio Constitution. The dissent's one-subject analysis illustrates why it is time for this court to reexamine our one-subject-rule jurisprudence and return to early understandings of the rule.

**{¶ 38}** The one-subject rule was adopted in 1851 among other provisions in former Article II, Section 16, of the Ohio Constitution, which governed legislative proceedings.

> Every bill shall be fully and distinctly read, on three different days, unless, in case of urgency, three-fourths of the house, in which it shall be pending, shall dispense with this rule. No bill shall contain more than one subject, which shall be clearly expressed in its title; and no law shall be revived, or amended, unless the new act contain the entire act revived, or the section or sections amended; and the section, or sections, so amended, shall be repealed.

Former Ohio Constitution, Article II, Section 16 (effective Sept. 1, 1851, to Nov. 3, 1903).

{¶ 39} Five years later, this court decided *Pim v. Nicholson*, 6 Ohio St. 176 (1856), its first opinion interpreting the one-subject rule. Judge Joseph R. Swan, who had served as a delegate to the 1850-1851 Constitutional Convention, wrote the court's unanimous opinion. *See* Kulewicz, *The History of the One-Subject Rule of the Ohio Constitution*, 45 Clev.St.L.Rev. 591, 594 (1997). The court ruled that the one-subject provision was "intended to operate upon bills in their progress through the general assembly" and "must be held to be directory only." *Pim* at 180. "It relates to bills and not to acts." *Id*. The court concluded that it was "unable to perceive" any evidence that the rule "was intended to effect any practical object for the benefit of the people in the examination, construction, or operation of acts passed and published." *Id.* at 179.

{¶ 40} The *Pim* decision generated vigorous discussion at the 1873-1874 constitutional convention. Several delegates proposed amendments to the rule in an attempt to abrogate the court's holding that the one-subject rule is directory and not mandatory. Because the court had held that the rule acted upon bills and not laws, one delegate sought to change the word "bill" to "law" in order to give the rule binding effect beyond the legislative process. *See* II Official Report of the

Proceedings and Debates of the Third Constitutional Convention of Ohio, 1873-1874, 280. After some debate as to the efficacy of the amendment, the same delegate then proposed the following substitution:

> No act shall embrace more than one subject, which shall be clearly expressed in its title, and if any subject shall be embraced in the act which shall not be expressly embraced in its title, such act shall be void as to so much thereof as shall not be so expressed.

*Id.* at 284. Various delegates, however, voiced their concern that the proposed amendments would lead to confusion and constant litigation as to whether an act contains more than one subject. *Id.* at 284-285. Ultimately, the delegates at the 1873-1874 convention did not make any changes to the one-subject rule.

{¶ 41} The language of the one-subject provision has remained intact since its adoption in 1851 except that the rule moved from Article II, Section 16, to Article II, Section 15(D) of the Constitution in 1973. Am.H.J.R. No. 5, 135 Ohio Laws, Part 1, 2037, 2040. And within a short time of its enactment, both the judicial and legislative branches clarified their understanding of the one-subject rule: that it imposed a limitation on bills, not acts, and that the legislature, not the judiciary, was to enforce it.

{¶ 42} This court adhered to *Pim*'s directory analysis for more than 100 years. In doing so, it acknowledged that a " 'manifestly gross and fraudulent violation of these rules might authorize the court to pronounce a law unconstitutional.' " (Emphasis deleted.) *State ex rel. Dix v. Celeste*, 11 Ohio St.3d 141, 144-145, 464 N.E.2d 153 (1984), quoting *Pim*, 6 Ohio St. at 180. But the court also acknowledged the need for, and the value of, great deference to legislative decisions about its internal proceedings.

**{¶ 43}** In *Dix*, Justice William B. Brown eloquently explained the history of the rule and the delicate balance struck by the court in *Pim*. "[B]y holding that the one-subject rule is directory and not mandatory, judicial interference with legislative action is reduced." *Id*. at 144. And by emphasizing the safeguard against manifestly gross and fraudulent violations, a proper balance is maintained.

**{¶ 44}** This balance, the court said, "recognizes the necessity of giving the General Assembly great latitude in enacting comprehensive legislation by not construing the one-subject provision so as to unnecessarily restrict the scope and operation of laws, or to multiply their number excessively, or to prevent legislation from embracing in one act all matters properly connected with one general subject." *Id*. at 145. It recognizes that the General Assembly may have "rational and practical reasons" for combining topics on certain subjects. *Id*. Rather than for the purpose of logrolling, combining provisions may be "for the purposes of bringing greater order and cohesion to the law or of coordinating an improvement of the law's substance." *Id*.

**{¶ 45}** Applying these principles and the need for balance, the *Dix* court examined the statute at issue only for "such a blatant violation of the one-subject rule so as to render it unconstitutional." *Id*. The court found no violation in a bill that combined an appropriation to fund programs that were transferred to a department of the state with the abolishment of a commission that had previously had responsibility for those programs.

**{¶ 46}** Over the next two decades, however, the court began to turn slowly away from these limiting principles. *See*, *e.g.*, *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections*, 62 Ohio St.3d 145, 580 N.E.2d 767 (1991); *State ex rel. Ohio AFL-CIO v. Voinovich*, 69 Ohio St.3d 225, 631 N.E.2d 582 (1994); *Simmons-Harris v. Goff*, 86 Ohio St.3d 1, 711 N.E.2d 203 (1999); *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 715 N.E.2d 1062 (1999). And by

2004, the court was completely loose from their moorings. *See In re Nowak*, 104 Ohio St.3d 466, 2004-Ohio-6777, 820 N.E.2d 335.

{¶ 47} In *Nowak*, this court announced that it would no longer view the one-subject rule as directory because it found that a provision cannot be both directory and capable of invalidating an enactment: "[t]he proposition that the one-subject rule is both directory and potentially capable of being applied by the court to invalidate a law is essentially an oxymoron." *Id.* at ¶ 38. Based on this incongruity, the court said that "[s]ince the one-subject provision is capable of invalidating an enactment, it cannot be considered merely directory in nature." *Id.* at ¶ 54. And with those words, the court jettisoned early legislative and judicial understandings of the rule.

{¶ 48} My concern is not so much about whether we call the one-subject rule directory or mandatory. It is, rather, about judicial overreach. In *Nowak*, as in so many other cases, this court lost sight of the fact that the constitutional provision had long been understood to recognize that the General Assembly may have legitimate reasons for combining topics into a substantial bill that pertains to one broad subject—a subject that might appear disjointed from a judicial perspective but that would serve legislative goals of cohesion, order, or improvement.

{¶ 49} Because it is unnecessary to reach the question whether the statutes at issue here violate the one-subject rule, this is not the case to reset our course. It is sufficient to say here that the substance of the one-subject rule has remained intact since its adoption in 1851. And at the time of the rule's adoption, the framers of the Ohio Constitution understood the one-subject rule as a matter of legislative procedure enforced by the General Assembly, not by the judiciary. This court should return to that understanding.

Kennedy and DeWine, JJ., concur in the foregoing opinion.

_____

**O'CONNOR, C.J., dissenting.**

**{¶ 50}** The majority resolves this case by finding that appellant's, Ohio Department of Health's ("ODH's"), revocation of appellee's, Capital Care Network of Toledo's, Ambulatory Surgical Facility ("ASF") license pursuant to Ohio Adm.Code 3701-83-05.1(C)(2) and 3701-83-19(E) is supported by reliable, probative, and substantial evidence and is in accordance with law. But I would find that Capital Care's written transfer agreement complied with the regulations.

**{¶ 51}** Because I would find that the agreement complied with the regulation, I find it necessary to determine whether the written-transfer-agreement provisions, R.C. 3702.303, 3702.304, and 3727.60, are constitutional. The majority erroneously fails to address the constitutionality of these provisions. I would hold that the General Assembly unconstitutionally enacted the statutory changes in violation of the one-subject rule, the statutes unconstitutionally place an undue burden on a woman's right to obtain a previability abortion, and the statutes unconstitutionally delegate licensure power to private parties. All three of these separate bases were properly reviewed by the lower courts and are clearly at issue before this court today. Therefore, I dissent.

## I. The Department of Health Revoked Capital Care's License Based on a Statutory Violation

**{¶ 52}** The majority states that "the legal issue presented to our court * * * concerns whether the order of the director of the Department of Health for the state of Ohio revoking the license of Capital Care Network of Toledo for failure to comply with Ohio Adm.Code 3701-83-19(E) is supported by reliable, probative, and substantial evidence and is in accordance with law." Majority opinion at ¶ 2. But ODH stated that its revocation order was "in accordance with R.C. 3702.32, R.C. 3702.303(A), R.C. Chapter 119, and OAC 3701-83-19(E)." Therefore, the majority is mistaken in resolving this case based only on the administrative regulation.

**{¶ 53}** The administrative code requires an ASF to have a transfer agreement with a hospital. Ohio Adm.Code 3701-83-19(E). The statute, R.C. 3702.303, effective September 29, 2013, requires an ASF to have a transfer agreement with a *local* hospital. ODH's first letter proposing license revocation, dated August 2, 2013, cited the administrative code. ODH claimed Capital Care was in violation of the administrative code for failing to have a transfer agreement with a hospital. But ODH did not schedule a hearing on the proposed revocation until February 18, 2014. During preparations for the hearing, Capital Care obtained a written transfer agreement with the University of Michigan, in January 2014.

**{¶ 54}** ODH's second letter proposing license revocation, dated February 18, 2014, cited violations of both the rule and the statute and noted that "ODH did not receive a copy of a written transfer agreement or a plan from Capital Care Network of Toledo setting forth how it planned to comply with O.A.C. 3701-83-19(E) until about January 16, 2014." The letter specifically stated that "R.C. 3702.303(A) requires the written transfer agreement to be with a local hospital" and identified the agreement with the University of Michigan as violating the local requirement.

**{¶ 55}** It is disingenuous for the majority to conclude that ODH revoked Capital Care's license in June 2014 solely based on a violation of the Ohio Administrative Code. ODH's second letter proposing license revocation specifically identified the University of Michigan agreement as violating the statute, not the regulation. Even at the hearing, ODH's director did not state that the written transfer agreement with the University of Michigan violated the rule, conjecturing merely, "I think there would have still been a question about it" absent the "local" requirement. I decline to accept the state's post hoc rationalization that the license revocation was based on the rule when the director still had a question whether that basis would have been sufficient.

**{¶ 56}** If Capital Care violated some other part of the regulation, R.C. 119.07 required ODH to give notice of the violation to Capital Care. ODH never provided that notice. Instead, ODH informed Capital Care that its license was being considered for revocation for failure to maintain a written transfer agreement with a local hospital, in violation of the statute, not the rule.

**{¶ 57}** By the time ODH issued its order revoking Capital Care's license in June 2014, the clinic had obtained a written transfer agreement that ODH's director rejected for failure to conform to the statute, not for failure to comply with the rule. Thus the majority must consider the validity of the statutory scheme.

## II. R.C. 3702.303, 3702.304, and 3727.60 are Unconstitutional

**{¶ 58}** Turning to the merits, I would find that R.C. 3702.303, 3702.304, and 3727.60, the written-transfer provisions for ASFs enacted as part of 2013 Am.Sub.H.B. No. 59 ("H.B. 59"), the fiscal-year 2014-2015 budget, are invalid for three separate reasons: (1) the provisions violate the one-subject rule, (2) the provisions create an undue burden on a woman's right to a previability abortion, and (3) R.C. 3702.303 and 3702.304 unconstitutionally delegate licensing power to private parties.

### A. The General Assembly Enacted R.C. 3702.303, 3702.304, and 3727.60 in Violation of the One-Subject Rule

**{¶ 59}** R.C. 3702.303, 3702.304, and 3727.60 were passed as part of the biennial budget for fiscal year 2014-2015. Because H.B. 59 is a budget bill, the more than 3500-page act mainly addresses funding and appropriations for state functions. The three sections at issue, concerning written transfer agreements, cover just three pages of the bill.

**{¶ 60}** R.C. 3702.303 creates a requirement that ASFs have a written transfer agreement with a local hospital. R.C. 3702.304 describes how an ASF can obtain a variance from the written-transfer-agreement requirement in R.C. 3702.303. R.C. 3727.60 prohibits public hospitals from entering into written

transfer agreements with ASFs that provide nontherapeutic abortions. It also prohibits physicians with staff or professional privileges at public hospitals from using those privileges to help ASFs that provide nontherapeutic abortions obtain a variance from the written-transfer-agreement requirement.

### 1. The one-subject challenge is properly before the court

{¶ 61} The state argues that this court cannot even consider the one-subject claim for two of the three statutes because Capital Care challenged only R.C. 3702.303, not all three provisions, on one-subject grounds and ODH's order was based only on R.C. 3702.303. I disagree. R.C. 119.12 governs the appeal of an administrative action, and R.C. 119.12(M) permits the court to "reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law." Although ODH did not consider R.C. 3702.304 and R.C. 3727.60, the court has authority to "make such other ruling as is supported by * * * evidence and is in accordance with law."

{¶ 62} And contrary to the state's claim, Capital Care did not waive a one-subject challenge related to R.C. 3702.304 and R.C. 3727.60. It was unnecessary for Capital Care to challenge the statutes' constitutionality at the administrative hearing, because it was outside the purview of the hearing examiner to determine the constitutionality of statutes. *See, e.g., S.S. Kresge Co. v. Bowers*, 170 Ohio St. 405, 166 N.E.2d 139 (1960), paragraph one of the syllabus. Because Capital Care makes a facial constitutional challenge, there was no need for the litigants to develop an evidentiary record, so the state was not prejudiced. *See Reading v. Pub. Util. Comm.*, 109 Ohio St.3d 193, 2006-Ohio-2181, 846 N.E.2d 840, ¶ 16.

{¶ 63} Although Capital Care was not explicit about the scope of its one-subject challenge on appeal to the trial court, its arguments put the state on notice that all three statutes were at issue and gave that court enough evidence to make a ruling. Capital Care argued in its brief to the trial court that "the written transfer agreement *provisions* are wholly unrelated to H.B. 59's primary subject," "the

written transfer agreement *provisions* were not passed on their own merits, but rather were added as *riders*," and "Ohio legislators buried controversial anti-abortion *provisions* in the pages of a budget bill." (Emphasis added.) Capital Care even specifically cited R.C. 3727.60, describing "*provisions* [that] were later amended to target abortion providers in the final hearing of the Senate Committee." (Emphasis added.) Multiple references to "provisions" and "riders" demonstrate that Capital Care was referring to more than just one statute. R.C. 3702.304, which permits the director of health to grant a variance from a written-transfer-agreement requirement under certain circumstances, and R.C. 3727.60, which prohibits hospitals from entering into "a written transfer agreement with an ambulatory surgical facility in which nontherapeutic abortions are performed," objectively are "written transfer agreement provisions" along with R.C. 3702.303.

{¶ 64} Additionally, the arguments made by both Capital Care and the state before the common pleas court apply to all three laws. Capital Care in fact challenged the entire bill, claiming that "H.B. 59 and the written transfer agreement provision are void and unenforceable." Specifically, Capital Care argued that the provisions "do not authorize the expenditure of state dollars or stipulate the amount, manner, or purpose of an expenditure" and "are inherently controversial and of significant constitutional import." For its part, the state, in its brief arguing against a one-subject violation, did not limit its argument to R.C. 3702.303. Instead, it claimed, "The Written Transfer Agreement Language of HB 59 * * * Does Not Violate the Single-Subject Rule," and it argued generally that "[t]he written transfer agreement provisions * * * fall within the unity of the purpose of the bill." In fact, the state did not argue that Capital Care failed to challenge R.C. 3702.303 and 3727.60 until its brief in this court, even after the trial court found the "Current Scheme [R.C. 3702.303, 3702.304, and 3727.60] for licensing abortion-center ASFs * * * violates the single-subject rule." Despite this notice, the state's brief to the Sixth District Court of Appeals was devoid of any argument that the scope of

Capital Care's one-subject challenge should be limited.  For these reasons, I would find that Capital Care properly challenged the validity of R.C. 3702.303, 3702.304, and 3727.60 under the one-subject rule, and the challenge was properly considered by the lower courts.

## 2. The written-transfer-agreement provisions of H.B. 59 violate the one-subject rule

{¶ 65} The concurring opinion's position that this court has no power to enforce the one-subject rule is inappropriate.  One restraint the people have placed on state power in the Ohio Constitution prescribes that "[n]o bill shall contain more than one subject, which shall be clearly expressed in its title."  Article II, Section 15(D), Ohio Constitution.  The concurring opinion argues that "it is time for this court to reexamine our one-subject-rule jurisprudence and return to early understandings of the rule."  Concurring opinion at ¶ 37.  Therefore, before considering the merits of the one-subject challenge, I find it necessary to consider the origins of the rule and its development over time.

{¶ 66} State constitutions "provide a blueprint for government, allocating authority among branches of power," and "establish charters of government that simultaneously empower and constrain."  Sutton, *What Does—and Does Not—Ail State Constitutional Law*, 59 U.Kan.L.Rev. 687 (2011).  Indeed, state constitutions were the first to place limits on state power.  Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489, 501 (1977) ("Prior to the adoption of the federal Constitution, each of the rights eventually recognized in the federal Bill of Rights had previously been protected in one or more state constitutions").  This early emphasis on the rights of the populace is enshrined in the Tenth Amendment to the United States Constitution, which decrees that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  All power then that is not explicitly retained by the federal or state governments resides with

the people. When the people use their power to place specific restraints on government, this court has a responsibility to honor and enforce that decision. Indeed, Judge Jeffrey Sutton, an Ohio constitutional-law scholar, recognized that state constitutions often contain provisions, including single-subject clauses, not found anywhere in the federal constitution, and state courts bear responsibility for vindicating these rights. Sutton, *Why Teach—and Why Study—State Constitutional Law,* 34 Okla.City U.L.Rev. 165, 176 (2009).

**{¶ 67}** The people first imposed the one-subject rule in the 1851 Ohio Constitution. "The particular grievances leading to the Ohio Constitutional Convention of 1850-51 included the legislature's * * * control over the judiciary and other state officers." Steinglass & Scarselli, *The Ohio State Constitution*, 4 (2011). We have recognized that the rule is a result of "the drafters' desire to place checks on the legislative branch's ability to exploit its position as the overwhelmingly pre-eminent branch of state government prior to 1851." *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 495, 715 N.E.2d 1062 (1999). Indeed, the entire 1851 Constitution reflects a "general distrust of legislative power." Steinglass & Scarselli at 35.

**{¶ 68}** This court has held that "[t]he universally recognized purpose of [one-subject] provisions is to prevent so-called 'logrolling.' " *State ex rel. Ohio Civ. Serv. Emps. Assn., AFSCME, Local 11, AFL-CIO v. State Emp. Relations Bd.*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 26 ("*OCSEA 2004*").[1]

---

[1] To the extent that there was limited debate about the one-subject rule in Ohio, the concern about logrolling was evident in the record of Indiana's constitutional convention which was being held almost contemporaneously. Evans & Bannister, *The Meaning and Purpose of State Constitutional Single Subject Rules: A Survey of States and the Indiana Example*, 49 Val.U.L.Rev. 87, 103 (2014). There, a delegate moved to add the following language to the constitution: "Every law shall embrace but one object, which shall be expressed in the title." *Id.* at 104, citing 2 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 1085 (1850). The delegate explained:

> The object of this amendment is to obviate a difficulty that frequently occurs in the Legislature. When a bill is presented and its friends are not numerous enough

Logrolling is "the practice by which several matters are consolidated in a single bill for the purpose of obtaining passage for proposals which would never achieve a majority if voted on separately." *Hoover v. Franklin Cty. Bd. of Commrs.*, 19 Ohio St.3d 1, 6, 482 N.E.2d 575 (1985). The rule prevents " 'riders' from being attached to bills that are ' * * * so certain of adoption that the rider will secure adoption not on its own merits, but on the measure to which it is attached.' " *State ex rel. Dix v. Celeste*, 11 Ohio St.3d 141, 143, 464 N.E.2d 153 (1984), quoting Ruud, "*No Law Shall Embrace More Than One Subject*," 42 Minn.L.Rev. 389, 391 (1958).

**{¶ 69}** The avoidance of logrolling promotes limitations on legislative power in at least two ways. First, it allows legislators to know exactly what they are voting on and prevents excessive measures, and accompanying government interference, from passage as part of omnibus bills. Second, it allows the public to know exactly how their legislators voted on any given measure and to reward or punish them at the ballot box on the basis of those specific votes. Without the one-subject rule, the public would have more difficulty isolating all the measures in a given piece of legislation, making it more difficult to hold their representatives responsible for choices with which they disagree. The one-subject rule also

---

> to pass it, and they enter into a coalition with gentlemen who desire the passage of some other measure to mutually assist each other in the passage of both combined under one head; and it is intended to prevent another difficulty, which often arises when only a part of the character of the bill is expressed in the title.

*Id.* The next delegate to speak offered:

> We have, sir, a precedent for such a provision. I have in my hand the Constitution of California which contains this provision, 'Every law shall contain but one subject, and that shall be expressed in the title.' *I suppose the object of it is to prevent the practice of logrolling*, as it has been termed by the Legislature. I am satisfied that the correct course is to adopt the provision. Almost every State Convention that has been called * * * has inserted a provision of this kind.

(Emphasis added and ellipses sic.) *Id.*

prevents legislators from evading responsibility for their votes by claiming that they did not agree with certain measures but had to vote yes in order to secure passage of other provisions they deemed necessary.

{¶ 70} Despite the clear policy behind the rule, and its use of "shall" in prohibiting more than one subject in a bill, this court held in 1856 that the one-subject rule was directory. *Pim v. Nicholson*, 6 Ohio St. 176 (1856). As the concurring opinion explains, the holding in *Pim* recognized the court's reluctance to interfere with the legislature. I would note that although the concurring opinion attempts to add weight to this court's decision in *Pim* by calling attention to the fact that Justice Joseph R. Swan, who served as a delegate to the 1850-1851 Constitutional Convention, wrote the opinion, the records of the convention reflect that on the day the convention agreed to add the one-subject rule to the constitution, a roll call was ordered and Swan was "found absent." II Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio 151 (1851). We therefore should reject the concurring opinion's invitation to imbue *Pim* with more authority than is due to any other decision of this court.

{¶ 71} The court declared in *Pim* that "[t]he subject of the bill is required to be clearly expressed in the title, for the purpose of advising members of its subject, when voting in cases in which the reading has been dispensed with by a two-thirds vote." *Pim* at 179. Then the court considered the role of the rule in preventing logrolling: "The provision that a bill shall contain but one subject, was to prevent combinations, by which various and distinct matters of legislation should gain a support which they could not if presented separately." *Id.* Although *Pim* declared the rule to be directory and found that "in general the only safeguard against the violation of these rules of the houses, is their regard for, and their oath to support, the constitution of the state," that declaration was not without caveat. *Id.* at 180. Even *Pim* recognized that "a manifestly gross and fraudulent violation of these rules

might authorize the court to pronounce a law unconstitutional." *Id.* The court "presumed that no such case will ever occur." *Id.*

**{¶ 72}** That presumption may have been appropriate for the time. The act in that case contained just five sections, filled less than two pages, and concerned the powers and procedures of courts. 53 Ohio Laws 178-179. It is unlikely that the court in 1856 could fathom a law, like the one here, that is more than 3,500 pages long and contains a title of more than 3,500 words.

**{¶ 73}** In addition to failing to consider the contextual differences between *Pim* and later one-subject challenges, in its history lesson, the concurring opinion fails to consider a major event in the history of the one-subject rule. In 1969, the General Assembly enacted legislation to create the Ohio Constitutional Revision Commission. Am.Sub.H.B. No. 240, 133 Ohio Laws, Part II, 1977. *See* Steinglass, *Constitutional Revision: Ohio Style*, 77 Ohio St.L.J. 281, 336 (2016). The commission's assignment, over ten years, was "to study the constitution, to make recommendations of proposed amendments to the General Assembly, and to make recommendations to a constitutional convention." Steinglass, 77 Ohio St.L.J. at 336-337.

**{¶ 74}** Among the revisions considered by the commission was moving or eliminating the one-subject rule. *Ohio Constitutional Revision Commission*, Final Report 124 (1977), available at Ohio Legislative Service Commission, https://www.lsc.ohio.gov/pages/reference/current/generalreference.aspx?active=id LegInform (accessed Jan. 23, 2018). "Testimony submitted to the Commission challenged the justification of retaining in the Constitution provisions which courts have termed 'directory only.' " *Id.* Nonetheless, the commission recommended keeping the one-subject rule and certain other provisions which the court had deemed directory, finding "that in some instances they provide a minimum guarantee for an orderly and fair legislative process. Their inclusion in the Constitution instead of legislative rule is in part, at least, for the protection of a

temporary minority whose rights may not be suspended by a majority willing to disregard traditional procedures." *Id.* at 125. The General Assembly adopted this recommendation and a related one to separate the single-subject rule from the three-reading rule and place each in their own subsection of the Constitution, in 1973. Am.H.J.R. No. 5, 135 Ohio Laws, Part I, 2037, 2040. The commission's recommendation, and the General Assembly's adoption of it, reaffirmed the relevance of the one-subject rule and established a basis for the court to reinvigorate it to ensure "an orderly and fair legislative process."

{¶ 75} Accordingly, for more than 30 years, this court has respected the General Assembly's power to make laws while at the same time refusing to "abdicate in its duty to enforce the Ohio Constitution." *Dix,* 11 Ohio St.3d at 144, 464 N.E.2d 153. With that balance in mind, this court has held that "[t]he mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics." *Hoover* at 6. "In order to find a legislative enactment violative of the one-subject rule, a court must determine that various topics contained therein lack a common purpose or relationship so that there is no discernible practical, rational or legitimate reason for combining the provisions in one Act." *Beagle v. Walden*, 78 Ohio St.3d 59, 62, 676 N.E.2d 506 (1997).

{¶ 76} Appropriations bills are particularly problematic for application of the one-subject rule. These bills necessarily "encompass many items, all bound by the thread of appropriations." *Simmons-Harris v. Goff*, 86 Ohio St.3d 1, 16, 711 N.E.2d 203 (1999). Yet, despite the difficulty of determining whether a provision in an appropriations bill violates the one-subject rule, "[t]he danger of riders is particularly evident when a bill as important and likely of passage as an appropriations bill is at issue. *Id.*

{¶ 77} This court has held a school-voucher program created in an appropriations bill was invalid due to the one-subject rule because there was blatant

disunity between the program and the other items in the bill, particularly when the state has provided no rational reason for their combination. *Id.* This court has also found invalid an amendment to an appropriations bill that excluded certain public employees from the collective-bargaining process because the amendment "was an extremely small portion" of the bill, *OCSEA 2004*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, at ¶ 32. The state "offered little guidance regarding the manner in which the amendment * * * affects the state budget, aside from the general averment that the amendment 'is related to the pay schedules applicable to [the employees],' " *id.* at ¶ 34, and "the record [was] devoid of any explanation whatever as to the manner in which the amendment * * * will clarify or alter the appropriation of state funds," *id.*

{¶ 78} On the other hand, this court found that a tax-levying provision in an appropriation bill was valid "because the tax fund[ed] government operations described elsewhere in the Act." *ComTech Sys., Inc. v. Limbach*, 59 Ohio St.3d 96, 99, 570 N.E.2d 1089 (1991). This court has also found sections in a budget bill providing for the privatization of certain state prisons valid because they "provide for decreased expenditures by public entities and provide means for revenue generation that can fund the operation of other programs and matters described in the bill." *State ex rel. Ohio Civ. Serv. Emps. Assn. v. State*, 146 Ohio St.3d 315, 2016-Ohio-478, 56 N.E.3d 913, ¶ 34 ("*OCSEA 2016*").

{¶ 79} The state argues that the one-subject rule was not violated because the three written-transfer provisions fall within the budget bill's purpose of making operating appropriations and setting conditions for efficient and effective operations of state government. Specifically, the state claims that R.C. 3727.60 sets a condition on the use of state-funded resources (public hospitals), thereby placing a restriction on state spending that rationally affects the budget. R.C. 3702.304 satisfies the one-subject rule, according to the state, because it improves ODH's operations by clarifying variance standards. These improvements relate to

the funding of continued operations of state programs, according to the state's argument, just like the provisions that this court found acceptable in *OCSEA 2016*. Finally, the state admits that R.C. 3702.303 has a less obvious connection to the budget but argues because it is closely related to the other two provisions, it does not violate the one-subject rule.

**{¶ 80}** These arguments fail for several reasons. First, although R.C. 3727.60 restricts public hospitals from entering into written transfer agreements with abortion clinics, the state has offered no evidence that these restrictions will reduce or even impact the budget. The Emergency Medical Treatment and Labor Act ("EMTALA") provides that "if any individual * * * comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination." 42 U.S.C. 1359dd(a). Accordingly, even though R.C. 3727.60 prohibits public hospitals from entering into a written transfer agreement with an abortion clinic, a public hospital will still have to provide emergency care for an abortion-clinic patient who appears at the hospital.

**{¶ 81}** The director of ODH verified the irrelevance of R.C. 3727.60 to public-emergency-room operations, testifying that if a patient is experiencing a life-threatening medical emergency, medical personnel would typically call 9-1-1 instead of using the written transfer agreement and first responders would take a patient in a life-threatening situation to the nearest hospital, notwithstanding the existence of a written transfer agreement with another facility. He testified that EMTALA requires the hospital to complete a medical assessment of a patient, notwithstanding the existence or lack thereof of a written transfer agreement.

**{¶ 82}** Thus, beyond the state's general averment that R.C. 3727.60 "ensures that no State funds, or operations of public hospitals, will even indirectly support abortion-related procedures," this court has before us no evidence to

support such a claim. Accordingly, the statute will have no measurable impact on the state's budget.

**{¶ 83}** The state's reliance on *OCSEA 2016* is similarly flawed. That case concerned prison-privatization provisions inserted into a biennial budget. Although this court rejected the one-subject claim based on the general conclusion that the provisions "relate to the overall subject of state expenditures and revenues," *OCSEA 2016*, 146 Ohio St.3d 315, 2016-Ohio-478, 56 N.E.3d 913, at ¶ 26, a significant factual record in that case demonstrated an actual impact on the budget.

**{¶ 84}** Specifically, the provisions allowed a public entity to contract with private companies to operate and manage state-owned prison facilities. In order to enter into such a contract, the law stated that the company must demonstrate that it would save the public entity five percent of the projected cost of the state to operate the prison. The law also stated that the company must demonstrate that it would not cost the state additional money, by showing it could operate the facility with the same inmate capacity and standards required of the public entity (therefore not diminishing the cost savings by requiring a publicly operated prison to take on additional prisoners or creating liability related to mistreatment) and indemnifying the state for certain claims and losses. The budget bill also provided for the sale of five Ohio prisons, leading to concrete revenue generation, and it directed where that revenue should go. Another provision described what taxes the prison would pay following sale to a private company, creating an additional revenue stream. These provisions, with their reference to specific revenue sources and descriptions of how the revenues were to be used, stand in stark contrast with what we have here— factually inaccurate averments about hospital resources.

**{¶ 85}** The state's dependence on other case law to support the validity of R.C. 3702.304 is likewise misguided. First, the state argues that *Dix* supports its claim that legislation may include a large number of topics when its purpose is to bring greater order and cohesion or improvement to the law. However, what *Dix*

actually says is that if a large number of topics "are germane to a single subject," they may be joined in one bill "for purposes of bringing greater order and cohesion to the law or of coordinating an improvement of the law's substance." 11 Ohio St.3d at 145, 464 N.E.2d 153. I do not believe this resolves the matter in favor of the state. The substance of H.B. 59 is the state's budget.

{¶ 86} Certainly, the state has not established here the same nexus that was present in *Dix*. There, the bill at issue abolished a commission, transferred its duties to another department, and created three new organizations in that department, and the one-subject challenge was to an appropriation that provided for funding of those three new organizations. The court found that the appropriation funding these new organizations was necessarily part of the same subject as the abolishment of the commission and transfer of its duties. There was little reason to be concerned with logrolling in *Dix*; the appropriation provision was required for the implementation of the new organizations created in the bill.

{¶ 87} Here, however, there can be no successful argument that the written-transfer-agreement provisions have a nexus to the biennial budget. Nothing about the challenged provisions is germane to the budget bill passed every two years by the General Assembly.

{¶ 88} Moreover, 15 years after *Dix*, this court recognized that *Dix* may weigh too heavily in favor of the General Assembly and that this court had, in the interim years, made "clear that we no longer view the one-subject rule as toothless." *Simmons-Harris*, 86 Ohio St.3d at 15, 711 N.E.2d 203. Yet toothless it would be if this court accepted the state's arguments and permitted any provisions that brought "greater order or cohesion" or "improvement" to any laws to be bound together in a single piece of legislation even when those provisions are not germane to a single subject.

{¶ 89} Having found that both R.C. 3727.60 and 3702.304 violate the one-subject rule, I find that R.C. 3702.303 is in violation as well, because the state relies

only on its connections to the other two provisions to save it from a one-subject challenge.

## B. The Sixth District Properly Considered the Constitutionality of the Statutory Scheme and Correctly Determined That It Created An Undue Burden

{¶ 90} The state argues that this court should not consider whether the statutory scheme places an undue burden on a woman's ability to obtain a previability abortion. I disagree and would find the written-transfer-agreement provisions create an undue burden.

### 1. This court must consider the undue-burden challenge

{¶ 91} First, in its appeal to the Sixth District, the state itself raised the undue-burden issue. Rather than asking the court not to rule on the undue-burden challenge due to waiver or lack of evidence, the state argued that the standard in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 878, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), was inapplicable because this case does not involve facial challenges to abortion-specific laws. Having the matter before it, the Sixth District could not ignore the United States Supreme Court's undue-burden analysis in *Whole Woman's Health v. Hellerstedt*, __ U.S. __, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016), which was released during the court of appeals' review of this matter. "It has long been settled that the Supremacy Clause binds state courts to decisions of the United States Supreme Court on questions of federal statutory and constitutional law." *State v. Burnett*, 93 Ohio St.3d 419, 422, 755 N.E.2d 857 (2001).

{¶ 92} Further, this court has specifically held that "[w]hen an issue of law that was not argued below is implicit in another issue that was argued and is presented by an appeal, we may consider and resolve that implicit issue." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 279, 617 N.E.2d 1075 (1993), *modified in part on other grounds*, *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538. *See also*

*State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 683, ¶ 68-70. Here, the state asks us to uphold the written-transfer-agreement provisions on the basis that they are "a valid health-and-safety regulation that applies to all outpatient surgical clinics, and * * * not an undue burden." To make such a finding without applying the recently clarified standards in *Whole Woman's Health* regarding undue burden would also run afoul of the Supremacy Clause. The state affirmatively put the undue-burden standard at issue before the Sixth District, asking that court to reverse the common pleas court on that basis, and then raised it again before this court. The state cannot now claim it is prejudiced by Capital Care's arguments on the merits of the undue-burden challenge.

**2. The undue-burden standard is applicable to any law affecting a woman's right to a previability abortion**

{¶ 93} Next, the state argues that the undue-burden standard is not applicable to laws not directly targeting abortion clinics. That argument is repudiated by *Whole Woman's Health*. Although it concerns laws specifically applicable to abortion clinics, the court's description of the undue-burden standard clearly makes it applicable to more neutral laws that have the "effect of presenting a substantial obstacle to a woman seeking an abortion." *Whole Woman's Health* at __, 136 S.Ct. at 2309, 195 L.Ed.2d 665, citing *Casey*, 505 U.S. at 878, 112 S.Ct. 2791, 120 L.Ed.2d 674.

{¶ 94} The state argues that "when neutral laws of general applicability merely intersect with a constitutional right, those laws do not trigger the same form of judicial review afforded to regulations actually aimed at the constitutional right." But the United States Supreme Court has held that a neutral law affecting a substantial right may be subject to more stringent review than a neutral law not impacting a substantial right. *See Holt v. Hobbs*, __ U.S. __, 135 S.Ct. 853, 859, 190 L.Ed.2d 747 (2015) (*Emp. Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 882, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) held that "neutral,

generally applicable laws that incidentally burden the exercise of religion *usually* do not violate the Free Exercise Clause of the First Amendment" [emphasis added]).

**{¶ 95}** Indeed, the authoring justices in *Casey* set forth a specific standard that was adopted by the court in *Whole Woman's Health*: "An undue burden exists, and therefore a provision of law is invalid, if its purpose *or effect* is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." (Emphasis added.) *Casey* at 878. *See also Whole Woman's Health* at __, 136 S.Ct. at 2309 ("We begin with the standard, as described in *Casey*"). By making the undue-burden test applicable if a law's "purpose *or* effect" creates a substantial obstacle for a woman to obtain a previability abortion, the court explicitly made the test available for challenging laws not specifically proposed to create an obstacle but that nonetheless did. (Emphasis added.) *Id.*

**{¶ 96}** *Whole Woman's Health* recognized that not every burden placed on the ability to procure an abortion is enough to invalidate it. *Whole Woman's Health* at __, 136 S.Ct. at 2313. The proper test is whether the obstacle is "substantial." *Id.* at __, 139 S.Ct. at 2309. The court, relying on Casey, did not limit the undue-burden standard to abortion-specific laws, but it emphasized that trivial impediments will not be unlawful. *Id.* at __, 136 S.Ct. at 2299. The court in *Baird* recognized this same distinction, rejecting the state's argument that the undue-burden standard was inapplicable. The court explained, "The generally applicable and neutral regulation in this case * * * affects an abortion clinic, which is unable to satisfy the regulation's requirements. Therefore, *Casey* and other relevant case law regarding state restrictions on abortion apply." 438 F.3d at 603.

**{¶ 97}** The court in *Whole Woman's Health* further clarified *Casey*, stating, "The rule announced in *Casey* * * * requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." __ U.S. at __, 136 S.Ct. at 2309. The court also emphasized the need for lower courts to

36

apply "judicial review applicable to the regulation of a constitutionally protected personal liberty" when abortion rights are at issue. *Id.* Because I would find that under *Whole Woman's Health* the undue-burden standard is applicable to this case, I now turn to its application.

### 3. The record contains sufficient evidence to conduct an undue-burden analysis

{¶ 98} I would find that the facts clearly establish that the written-transfer-agreement provisions of H.B. 59 place an undue burden on an Ohio woman's right to a previability abortion.

{¶ 99} *Whole Woman's Health* set forth the following test: "consider the burdens a law imposes on abortion access together with the benefits those laws confer" and determine "whether any burden imposed on abortion access is 'undue.' " __ U.S. at __, 136 S.Ct. at 2309-2310. I therefore must consider both the benefits and burdens that the new statutory scheme imposes. The testimony at the Ohio Department of Public Health Licensing hearing provides ample evidence to review.[2]

{¶ 100} Dr. Theodore Wymyslo, the director of ODH, testified that the written transfer agreement secures the benefit of fast and easy follow-up treatment

---

[2] Despite now claiming prejudice because of a lack of notice of a constitutional challenge, the state objected at least twice at the license-revocation hearing to inquiries related to constitutional matters. First, the state objected to a line of questions about where a woman could obtain an abortion if Capital Care closed. The state objected to relevance, arguing that "[t]his is a licensure case; this is not a constitutional case." Capital Care's counsel responded that she was making the foundation for a constitutional argument, and the hearing examiner agreed she could make the record. The state next objected to questions concerning the burdens women face when they lack access to legal abortions. The attorney objected, "[T]his is not a constitutional case. * * * I see the road we're going down. * * * With all due respect, you don't have the authority to decide constitutional issues. And we're not here to create a record for a federal lawsuit." The hearing examiner again overruled the state's objections, stating, "I think the Common Pleas court had [sic] the authority to decide a constitutional issue. And I'm going to let her make her record."

for complications or emergencies resulting from an abortion procedure by "an organization that has greater capacity than the ambulatory surgical facility to definitively deal with the complication or problem that arises." He also testified that written transfer agreements ensure that "if a patient has a problem, there is already a preordained method by which the patient is transferred." According to Dr. Wymyslo, EMTALA does not define what a hospital must do beyond "medical assessment and medical treatment when an emergency patient comes in." The emergency room may have to spend "hours of time" learning what happened to the patient that caused the emergency visit, which reduces quality of care. Dr. Wymyslo also testified that "it's faster and more efficient and better quality care" if patients who need inpatient follow-up care are admitted in a manner that has "been preordained and predirected by a prior agreement."

{¶ 101} But Dr. Wymyslo admitted that when his own private practice experienced an emergency, the office would call 9-1-1 to transport the patient to the emergency room. He stated that in a life-threatening situation, emergency services would take a patient to the nearest hospital, which would be obligated to take care of the patient.

{¶ 102} Nurse Terrie Hubbard, Capital Care's owner, testified that she asked the fire stations closest to Capital Care where they would take a patient in a life-threatening situation. First responders informed her they would take a patient from the clinic to Toledo Hospital, and she would have no opportunity to direct the ambulance to use the University of Michigan Health System instead. Dr. Wymyslo testified that patients who leave an ASF are not obligated to return to seek follow-up for complications either at the ASF or at the facility with the written transfer agreement but "are free to make their own personal decision about where they receive care." Thus, the benefit of a written transfer agreement appears to be only theoretical: in case of emergency, first responders would transport the patient to the nearest hospital regardless of the existence of a written transfer agreement with the

hospital; in cases of non-emergency complications after treatment, a patient can go where she chooses.

{¶ 103} The testimony also demonstrated that complications or emergencies are rare. Nurse Hubbard testified that during her eight years at Capital Care, there was never a need to transfer a patient to the hospital. Dr. Harley Blank, an Ohio-licensed doctor since 1964, testified that in his 41 years working at a Columbus abortion clinic, approximately six or seven women were transferred to a hospital as a result of complications from the abortion procedure.

{¶ 104} As detailed in the delegation section below, without a written transfer agreement or a variance application, the state will have no ability to waive the license requirement for Capital Care, and the facility will have to close. Nurse Hubbard testified that as of the date of the hearing, despite contacting more than ten hospitals and several doctors, she had been unable to find a local hospital willing to enter into a written transfer agreement, or a physician willing to offer his or her admitting privileges as a means of obtaining a variance. Dr. Wymyslo testified that the only abortion clinic he knew of in northwestern Ohio was Capital Care and that if it closed, women would have to travel to Cleveland or Columbus to obtain an abortion at a licensed clinic. Nurse Hubbard testified that Capital Care patients come from Indiana, Michigan, West Virginia, and Ohio.

{¶ 105} Dr. Blank testified that in his opinion as a gynecologist, there would be a negative effect on Ohio women if they did not have access to safe, legal abortions. Specifically, he testified that during his medical residency he witnessed two to three "botched illegal abortions a week with sometimes catastrophic consequences," including death. He identified other complications from illegal abortions, including infection, bleeding, perforation of the uterus, loss of fertility, and loss of productivity.

### 4. The written-transfer-agreement provisions create an undue burden

{¶ 106} The testimony establishes that there is no benefit in the written-transfer-agreement provisions for patients in life-threatening situations, who will be sent to the nearest hospital notwithstanding the clinic's written transfer agreement. At best, the written-transfer-agreement provisions confer a theoretical benefit to patients who seek follow-up care for non-emergency complications related to their abortion procedures and who may have a simpler time obtaining treatment at a hospital with a written transfer agreement. But the evidence shows a very small number of women require treatment for non-emergency complications while they are still at the facility and there is no evidence that a patient would specifically seek out the hospital with the written transfer agreement instead of a healthcare facility close to home after leaving the clinic.

{¶ 107} These limited and speculative benefits are not sufficient to justify the burdens on access to abortion services caused by the statutes. There is ample evidence that R.C. 3703.303, 3703.304, and 3727.60 will cause northwestern Ohio's only remaining abortion clinic to close. Toledo will be left without an abortion clinic, forcing women from northwestern Ohio to travel to clinics in Cleveland or Columbus to obtain an abortion at a clinic. Obstacles caused by clinic closures, including increased crowds and longer weight times at remaining clinics and increased travel distance for patients, were recognized as substantial and provided a basis for the United States Supreme Court's determination that the admitting-privileges law at issue in *Whole Woman's Health* presented an undue burden. __ U.S. at __, 136 S.Ct. at 2313, 195 L.Ed.2d 663.

{¶ 108} Particularly in light of the absence of real benefit conferred by the statutes and the burdens created by the written-transfer-agreement provisions, I would find that the provisions do not confer benefits sufficient to justify the burden. Thus, the laws are unconstitutional.

*C. R.C. 3702.303 and 3702.304 Unconstitutionally Delegates the State's Licensure Power to Private Actors*

{¶ 109} Although the state derides the nondelegation doctrine as dead, that obituary is to be written only by the United States Supreme Court, which has not yet done so. Although the court has not relied on the private nondelegation doctrine for a substantial time, it has not interfered with lower federal courts' application of the doctrine. The Supremacy Clause requires us to follow the United States Supreme Court's interpretation of federal and constitutional law until that court explicitly adopts a new understanding. Accordingly, the majority should have applied the doctrine to determine if the written transfer and variance laws constitute an unconstitutional delegation of authority to a third-party, in this case doctors and hospitals. I find they do.

### 1. The nondelegation doctrine is not dead

{¶ 110} The nondelegation doctrine has a long history in constitutional law. Initially, courts invoked the doctrine to prevent Congress from delegating lawmaking authority to the executive branch. *Mistretta v. United States*, 488 U.S. 361, 371-372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), quoting *Field v. Clark*, 143 U.S. 649, 692, 12 S.Ct. 495, 36 L.Ed. 294 (1892) (" 'the integrity and maintenance of the system of government ordained by the Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch"). Later, the court applied the doctrine to prevent the legislature from vesting state authority in private actors who were not constrained by the due-process clause. *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936). *See also Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982).

{¶ 111} In *Carter*, the United States Supreme Court considered a federal law delegating power to fix maximum hours of labor and wages for coal miners to large regional coal producers. The court found that "[t]his is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official

body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Id.* at 311. The court declared, "[A] statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property [and is] clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment." *Id.*

**{¶ 112}** The court mentioned the nondelegation doctrine again in *Mistretta*, in which it upheld Congress's delegation of power to the United States Sentencing Commission because " '[t]he statute * * * explains what the Commission should do and how it should do it, and sets out specific directives to govern particular situations.' " *Id.* at 379, quoting *United States v. Chambless*, 680 F.Supp. 793, 796 (E.D.La. 1988). And in a more recent case, although a majority of the court passed on applying the private nondelegation doctrine because it found Amtrak is a public entity for purposes of congressional delegation, Justice Alito described the dangers of private delegation in his concurring opinion. *Dept. of Transp. v. Assn. of Am. RRs.*, __U.S. __, 135 S.Ct. 1225, 1234, 191 L.Ed.2d 153 (2015) (Alito, J., concurring). He warned: "Liberty requires accountability. When citizens cannot readily identify the source of legislation or regulation that affects their lives, Government officials can wield power without owning up to the consequences. One way the Government can regulate without accountability is by passing off a Government operation as an independent private concern." *Id.*

**{¶ 113}** Justice Alito expressed particular concern about the law's provision for appointment of an arbitrator to conduct binding arbitration between the Federal Railroad Administration and Amtrak if the parties could not agree on certain regulatory metrics and standards. *Id.* at 1236. He wrote, "If the arbitrator can be a private person, this law is unconstitutional. Even the United States accepts that 'Congress cannot delegate regulatory authority to a private entity.' " *Id.* at 1237, quoting *Assn. of Am. RRs. v. United States Dept. of Transp.* 721 F.3d 666, 670

42

(D.C.Cir.2013) While recognizing the Supreme Court's reluctance to apply the nondelegation doctrine when Congress vests power in other agencies, Justice Alito declared, "When it comes to private entities * * * there is not even a fig leaf of constitutional justification." *Id.*

{¶ 114} This court has also considered the nondelegation doctrine in Ohio, albeit in limited circumstances. In *Redman v. Ohio Dept. of Indus. Relations*, this court considered the nondelegation doctrine as it related to the General Assembly granting power to an administrative agency. 75 Ohio St.3d 399, 662 N.E.2d 352 (1996). In that context, this court found, " 'A statute does not unconstitutionally delegate legislative power if it establishes, through legislative policy and such standards as are practical, an intelligible principle to which the administrative officer or body must conform and further establishes a procedure whereby exercise of the discretion can be reviewed effectively.' " *Id.* at 406, quoting *Blue Cross of Northeast Ohio v. Ratchford*, 64 Ohio St.2d 256, 416 N.E.2d 614 (1980), syllabus. Although *Redman* concerned delegation to an agency, when the legislature delegates authority to a private actor at least as high a standard for intelligible principles governing the procedure and ability to review is necessary.

### 2. Federal courts routinely apply the nondelegation doctrine to laws requiring written transfer agreements and admitting privileges

{¶ 115} At least eight federal courts cases have applied the private nondelegation doctrine to regulations and statutes governing abortion clinics since the United States Supreme Court decided a woman has a fundamental right to an abortion in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In *Hallmark Clinic v. North Carolina Dept. of Human Resources*, 380 F.Supp. 1153 (E.D.N.C. 1974), the district court enjoined enforcement of a North Carolina regulation requiring abortion clinics to have written transfer agreements. In that case, it was undisputed that the state had "placed no limits on the hospital's decision to grant or withhold a transfer agreement, or even to ignore a request for one." *Id.*

at 1158. The court recognized that "the Supreme Court has repeatedly held that licensing schemes are invalid unless official discretion to deny permits is confined by precise standards" and determined that "[b]y conditioning the license on a transfer agreement, the state has given hospitals the arbitrary power to veto the performance of abortions for any reason or no reason at all." *Id.* The court concluded, "If the state is determined to utilize hospitals as a control factor for the protection of patients in freestanding abortion clinics then it must establish and enforce standards for admission to hospital staff privileges." *Id.* at 1159.

{¶ 116} A federal district court in Michigan struck down a similar written-transfer-agreement requirement as part of a licensing scheme in that state. *Birth Control Ctrs., Inc. v. Reizen*, 508 F.Supp. 1366 (E.D.Mich.1981), *aff'd in part and vacated in part on other grounds*, 743 F.2d 352 (6th Cir.1984). The Michigan licensing rule required an abortion clinic to have a written transfer agreement with a hospital less than 30 minutes away or, according to the Department of Public Health's interpretation, at least an agreement with a physician who had staff privileges at such a hospital and agreed to be the admitting and attending physician for abortion clinic patients seeking follow-up care at the hospital. The court found that the rule and the interpretation violated "due process concepts because they delegate a licensing function to private entities without standards to guide their discretion." *Id.* at 1374. The court further determined that it was not relevant that the rule applied to all freestanding surgical outpatient facilities because the "defect lies in the delegation of unguided power to a private entity, whose self-interest could color its decision to assist licensure of a competitor." *Id.* at 1374-1375. The court concluded that such a "delegation without standards or safeguards to protect unfairness, arbitrariness or favoritism is void for lack of due process." *Id.* at 1375.

{¶ 117} More recently, a Wisconsin district court invalidated a state law prohibiting a physician from performing an abortion unless he or she had admitting privileges at a hospital within 30 miles of the location where the abortion was to

take place. *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 94 F.Supp.3d 949, 953 (W.D.Wis.2015) ("*Van Hollen II*"), *aff'd*, 806 F.3d 908 (7th Cir.2015). In an earlier decision in which the district court denied the clinic's motion for summary judgment, it observed that the Fourteenth Amendment to the United States Constitution prohibits states from depriving license holders of their right to continue to do business without due process and that "[p]art of this protection is insuring that any delegation to a private, non-state actor 'sets clear boundaries' on the exercise of discretion by 'contain[ing] detailed directives.' " *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 23 F.Supp.3d 956, 962 (W.D.Wis.2014), quoting *United States v. Goodwin*, 717 F.3d 511, 517 (7th Cir.2013). After reviewing all of the evidence at trial, the district court found that the statute puts "quality monitoring in the hands of private entities with non-uniform criteria and with admitted interests having nothing to do with an individual doctor's quality of care" and that "those interests run counter to granting privileges to abortion providers, who unquestionably offer little chance of hospital referrals and a real risk of controversy if formally associated with the hospital." *Van Hollen II* at 979. The court found relevant that "the statutory provision does not provide a mechanism by which the State could intervene, for example by providing a waiver to the admission privilege because the physician's qualifications were not at issue." *Id.* at 996. Ultimately, the district court concluded that because the admitting-privileges requirement did not further a legitimate state interest, it could not be imposed through third parties absent a waiver provision or some other mechanism to ensure due process. *Id.* at 979. *Compare Women's Health Ctr. of West Cty., Inc. v. Webster*, 871 F.2d 1377, 1382 (8th Cir.1989), and *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 748 F.3d 583, 600 (5th Cir.2014) (finding state requirements that abortion providers, not clinics, have admitting privileges at a hospital is no more of a significant threat to the providers' due-

process rights than the requirement that those performing abortions be licensed physicians).

{¶ 118} Although some federal courts have ruled in favor of states on delegation challenges related to abortion-clinic licensing, those cases are readily distinguished because they involve more detailed directives from the state or more substantial review authority.

{¶ 119} In *Greenville Women's Clinic v. Commr., South Carolina Dept. of Health & Environmental Control*, 317 F.3d 357 (4th Cir.2002), the appellate court rejected a challenge to a rule requiring clinic doctors to have admitting privileges at local hospitals. The court relied on the fact that the doctors at the plaintiff clinic had been able to secure admitting privileges to establish that "the possibility that the requirement will amount to a third-party veto power is so remote" that it could not withstand a facial challenge. *Id.* at 363. The challenge was further weakened because South Carolina required public hospitals not to "act unreasonably, arbitrarily, capriciously, or discriminatorily in granting or denying admitting privileges," *id.* at 362, and the clinic could petition the state for a waiver or exception to the admitting privilege requirement, *id.* at 363.

{¶ 120} In *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir.2004), the court rejected a challenge to an Arizona regulation requiring that a physician with admitting privileges at an Arizona hospital be present at an abortion clinic until a patient is stable following each abortion procedure. The court found that "Arizona law requires hospitals to refrain from arbitrary provision of admitting privileges and requires them to exercise their discretion based on reasons related to the hospital's interest," *id.* at 555, and that state law provided for judicial review of hospital procedures to determine if they comported with reasonable standards and due process, *id.* at 555-556.

{¶ 121} Of course, the most relevant federal case to this matter is *Women's Med. Professional Corp. v. Baird*, 438 F.3d 595 (6th Cir.2006), which upheld

Ohio's written-transfer-agreement regulations. The majority relies on later versions of these same regulations, upon which R.C. 3702.303 and 3702.304 are based, to uphold the license revocation in this case. The regulations require ambulatory surgical facilities to have a written transfer agreement with a hospital, but an ASF could obtain a variance if " 'the director determines that the strict application of the license requirement would cause an undue hardship * * * and that granting the waiver would not jeopardize the health and safety of any patient.' " *Id.* at 599, quoting former Ohio Adm.Code 3701-83-14, 2002-2003 Ohio Monthly Record 224, effective September 5, 2002. The district court in *Baird* had found the regulations impermissibly delegated authority to hospitals to grant a license to an abortion clinic by entering into a written transfer agreement. *Id.* at 609. Indeed, the director of ODH had "admitted that Ohio has no power over hospitals to direct them as to how to respond to requests for written transfer agreements and that hospitals could deny such a request for business, religious, personal, or political reasons." *Id.*

{¶ 122} The appellate court disagreed and upheld the regulations on the narrow basis that the director of ODH "retains authority to grant a waiver of the transfer agreement requirement," unlike in *Hallmark Clinic* or *Reizen*. *Id.* at 610. The court held that "[b]ecause the waiver procedure allows the state to make the final decision about whether ASFs obtain a license, there was no impermissible delegation of authority to a third party." *Id.*

### 3. R.C. 3702.303 and R.C. 3702.304 violate the nondelegation doctrine

{¶ 123} The state asserts that this court should reach the same conclusion that the Sixth Circuit did in *Baird* with respect to the statutes challenged here because "[t]he Variance Statute basically codified the Department's prior variance *practice*. It is the Director who ultimately grants facility licenses." (Emphasis sic.) Capital Care counters that the "final decision whether a hospital will sign an agreement to transfer a patient or a doctor will sign an agreement to admit a patient,

rests in the hands of those third parties * * * [and the director] had no discretion to waive these statutory requirements." Accordingly, Capital Care argues that the statutes unlawfully delegate licensing authority to third parties.

{¶ 124} Because the Sixth Circuit already upheld the constitutionality of the variance *regulation* against a nondelegation doctrine challenge, it is necessary to consider how the statute differs. Ohio Adm.Code 3701-83-19(E) requires each ASF to "have a written transfer agreement with a hospital for transfer of patients in the event of medical complications, emergency situations, and for other needs as they arise." The variance regulation permits the director to "grant a variance or waiver from any building or safety requirement," Ohio Adm.Code 3701-83-14(A), if "the director determines that the requirement has been met in an alternative manner," *id.* at (C)(1), or that "the strict application of the license requirement would cause an undue hardship" and "granting the waiver would not jeopardize the health and safety of any patient," *id.* at (C)(2).

{¶ 125} Unlike the variance regulation, R.C. 3702.303(C)(2) permits the director to grant a variance from the written-transfer-agreement requirement, but only if the ASF submits a "letter, contract, or memorandum of understanding signed by the facility and one or more consulting physicians who have admitting privileges at a minimum of one local hospital, memorializing the physician or physicians' agreement to provide back-up coverage," R.C. 3702.304(B)(2), along with "[d]ocumented verification that each hospital at which the physician has admitting privileges has been informed in writing by the physician that the physician is a consulting physician for the ambulatory surgical facility," R.C. 3702.304(B)(3)(e). R.C. 3727.60(B) imposes additional restrictions not found in the regulations, prohibiting public hospitals from entering into a written transfer agreement with abortion clinics and forbidding doctors with admitting privileges at public hospitals from using those privileges to help an abortion clinic obtain a variance.

{¶ 126} Thus, the ability of the director to grant a variance is substantially different under the statutory scheme than under the regulatory scheme, because it is conditioned on action by a private actor. Under the rules considered in *Baird*, the director could grant a variance if he determined the licensing requirements were met in another manner or grant a waiver if strict application of the requirement would cause an undue hardship to the ASF and the waiver would not jeopardize the health and safety of the patient. The decision was entirely the director's.

{¶ 127} But under the statutory scheme here, the director's discretion is superseded by the ability or willingness of a private actor to associate with the ASF. Absent a local private hospital willing to enter into a written transfer agreement with an ASF, the only option for the ASF is to obtain an agreement with a physician who has admitting privileges at a local private hospital and is willing to use them on behalf of the ASF. Without one of these specific agreements from a private party, the director has no discretion to grant a waiver.

{¶ 128} This is plainly a different situation than the federal court contemplated in *Baird*. Without these third-party agreements, there is no application for ODH to consider. Unlike the regulations in *Baird*, the statute here is not saved by the director's authority to review private third-party action through the variance process.

{¶ 129} And unlike the delegations of authority in *Greenville Women's Clinic* and *Eden*, the law is not saved by legislatively created principles or standards to guide the third parties. The state points to no law that establishes standards or procedures for a hospital to follow in determining whether to enter into a written transfer agreement or to guide a doctor in determining whether to grant an ASF the benefit of his or her admitting privileges for purposes of a variance.

{¶ 130} Practical, intelligible standards and a procedure for effective review are two hallmarks that this court has looked to in delegation by a legislature to even an administrative agency, *Redman*, 75 Ohio St.3d at 406, 662 N.E.2d 352, but in

this case the state has provided no standards or review procedure after wholly delegating licensing authority to private third-party doctors and hospitals. Here, the statutory scheme is exactly what the United States Supreme Court warned against in *Carter* more than 80 years ago—the delegation "to private persons whose interests may be and often are adverse to the interests of others in the same business." 298 U.S. at 311, 56 S.Ct. 855, 80 L.Ed. 1160. As the court determined then, I would find now that "a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property" and is "clearly a denial of rights safeguarded by the due process clause." *Id.* Further, as Justice Alito warned, statutes like these allow the government to "regulate without accountability * * * by passing off a Government operation as an independent private concern." *Assn. of Am. RRs.*, __ U.S., at __, 135 S.Ct. at 1234, 191 L.Ed.2d 153 (Alito, J., concurring).

{¶ 131} The statutory scheme, if allowed to stand, permits the legislature to do through private actors what it may not legally do following *Roe* and its progeny: wholly prevent a woman from exercising her fundamental right to a previability abortion. I would find that R.C. 3702.303 and R.C. 3702.304 unconstitutionally delegate state licensing authority to private actors without the barest concern for due process. Further, I would find that the offending provisions cannot be severed and therefore must be invalidated. This invalidation would render R.C. 3727.60 meaningless, as it relies on the definition of "written transfer agreement" in R.C. 3702.303 and the variance application process described in R.C. 3702.304.

### III. Conclusion

For the foregoing reasons, I would affirm the decision of the Sixth District Court of Appeals.

O'NEILL, J., concurs in the foregoing opinion.

_____

Gerhardstein & Branch Co., L.P.A., Jennifer L. Branch, and Alphonse A. Gerhardstein, for appellee.

Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, Stephen P. Carney and Peter T. Reed, Deputy Solicitors, and Ryan L. Richardson and Tiffany L. Carwile, Assistant Attorneys General, for appellant.

_____